# NEW YORK RAPID TRANSIT CORP. *v.* CITY OF NEW YORK.*

No. 435.   Argued February 7, 1938.—Decided March 28, 1938.

---

\* Together with No. 436, *Brooklyn & Queens Transit Corp. v. City of New York,* also on appeal from the Supreme Court of New York.

574

*Messrs. Harold L. Warner* and *Paul D. Miller,* with whom *Messrs. George D. Yeomans, Andrew M. Williams,* and *Arthur A. Ballantine* were on the briefs, for appellants.

*Mr. Paxton Blair,* with whom *Messrs. William C. Chanler, Oscar S. Cox,* and *Sol Charles Levine* were on the briefs, for appellee.

MR. JUSTICE REED delivered the opinion of the Court.

The question for decision is the constitutional validity of Local Laws of the City of New York (Local Law No. 21 of 1934, as amended by Local Law No. 2 of 1935, and extended by Local Law No. 30 of 1935) which provide, § 2, that "for the privilege of exercising its franchise or franchises, or of holding property, or of doing business in

the City of New York" an excise tax shall be paid by every "utility" doing business in the City of New York during 1935 and the first six months of 1936.

"Utility" is defined, § 1 (e), to include "any person subject to the supervision of either division of the department of public service," and every person, whether or not subject to such supervision, engaged "in the business of furnishing or selling to other persons, gas, electricity, steam, water, refrigeration, telephony and/or telegraphy" or service in these commodities. Each utility is required to pay a tax "equal to three percentum of its gross income" received during the effective period of the Local Laws, with a minor variation not here assailed for utilities not subject to the specified supervision.[1] The Local Laws specify that all revenues from the tax "shall be deposited in a separate bank account or accounts, and shall be available and used solely and exclusively for the purpose of relieving the people of the City of New York from the hardships and suffering caused by unemployment" (§ 14). The Local Laws, admittedly passed under authority granted by the state legislature,[2] are assailed under the United States Constitution. For convenience we shall discuss the contentions of the New York Rapid Transit Corporation alone, as determination of the objections

---

[1] Utilities subject to the supervision of the department of public service pay three per cent. of their "gross income," as defined by § 1(c); the other utilities pay three per cent. of their "gross operating income," as defined by § 1 (d).

[2] N. Y. Laws 1934, c. 873, authorized any city of a million inhabitants to impose for purposes of unemployment relief any tax within the powers of the state legislature, including a tax on gross income or gross receipts of those doing business in the city. The act specifically provided (§ 2) that the revenues shall be deposited in a separate bank account and used solely for the relief purposes. The authority granted by this statute expired December 31, 1935, but was extended, with certain restrictions not material here, until July 1, 1936, by N. Y. Laws 1935, c. 601.

raised by it is conclusive of those advanced by the Brooklyn and Queens Transit Corporation.

The New York Rapid Transit Corporation operates rapid transit railroads in the City of New York under a contract known as Contract No. 4, dated March 19, 1913, made pursuant to the New York Rapid Transit Act, Laws 1891, c. 4, as amended, between its predecessor (New York Municipal Railway Corporation) and the City. As a common carrier engaged in the operation of rapid transit railroads, the corporation is under the supervision of the transit commission, the head of the metropolitan division of the state department of public service. Accordingly, but under protest, it paid the taxes imposed by the Local Laws set out above, for the months January, 1935, to June, 1936, inclusive. It brought this action against the City of New York to recover the amounts paid, $1,408,697, with interest, on the ground that the Local Laws are unconstitutional. The case arises on the City's motion to dismiss the complaint.

The Supreme Court of New York, Special Term, denied the motion to dismiss the complaint and found that the Local Laws denied equal protection because of gross inequality of burden in comparison with other utilities. This order was affirmed by the Appellate Division of the Supreme Court, without opinion, on a 3–2 vote (251 App. Div. 710; 296 N. Y. S. 1006). The Court of Appeals reversed (275 N. Y. 258; 9 N. E. 2d 858), upheld the Local Laws against all attacks, and ruled that the complaint did not state a cause of action. Appeal was taken to this Court under § 237 (a) of the Judicial Code, 28 U. S. C. § 344 (a).

The Corporation challenges the Local Laws as violative of the equal protection and due process clauses of the 14th Amendment and the contracts clause of Article I, § 10, of the Constitution.

578

*I. Classification.* No question is or could be made by the Corporation as to the right of a state, or a municipality with properly delegated powers, to enact laws or ordinances, based on reasonable classification of the objects of the legislation or of the persons whom it affects. "Equal protection" does not prohibit this. Although the wide discretion as to classification retained by a legislature, often results in narrow distinctions, these distinctions, if reasonably related to the object of the legislation, are sufficient to justify the classification. *German Alliance Ins. Co.* v. *Lewis,* 233 U. S. 389, 418; *Atchison, T. & S. F. R. Co.* v. *Matthews,* 174 U. S. 96, 105; *Giozza* v. *Tiernan,* 148 U. S. 657. Indeed, it has long been the law under the 14th Amendment that "a distinction in legislation is not arbitrary, if any state of facts reasonably can be conceived that would sustain it, . . ." *Rast* v. *Van Deman & Lewis Co.,* 240 U. S. 342, 357; *Borden's Co.* v. *Baldwin,* 293 U. S. 194, 209; *Metropolitan Casualty Ins. Co.* v. *Brownell,* 294 U. S. 580, 584. "The rule of equality permits many practical inequalities." *Magoun* v. *Illinois Trust & Savings Bank,* 170 U. S. 283, 296; *Breedlove* v. *Suttles,* 302 U. S. 277, 281; *Carmichael* v. *Southern Coal & Coke Co.,* 301 U. S. 495, 509. "What satisfies this equality has not been and probably never can be precisely defined." *Magoun* v. *Illinois Trust & Savings Bank, supra,* 293.

The power to make distinctions exists with full vigor in the field of taxation, where no "iron rule" of equality has ever been enforced upon the states. *Bell's Gap R. Co.* v. *Pennsylvania,* 134 U. S. 232, 237; *Giozza* v. *Tiernan,* 148 U. S. 657, 662. A state may exercise a wide discretion in selecting the subjects of taxation (*Magoun* v. *Illinois Trust & Savings Bank,* 170 U. S. 283, 294; *Quong Wing* v. *Kirkendall,* 223 U. S. 59, 62; *Heisler* v. *Thomas Colliery Co.,* 260 U. S. 245, 255) "particularly

as respects occupation taxes," *Oliver Iron Mining Co.* v. *Lord,* 262 U. S. 172, 179; *Brown-Forman Co.* v. *Kentucky,* 217 U. S. 563, 573; *Southwestern Oil Co.* v. *Texas,* 217 U. S. 114, 121, 126; see *Ohio Oil Co.* v. *Conway,* 281 U. S. 146, 159.

Since carriers or other utilities with the right of eminent domain, the use of public property, special franchises or public contracts, have many points of distinction from other businesses, including relative freedom from competition, especially significant with increasing density of population and municipal expansion, these public service organizations have no valid ground by virtue of the equal protection clause to object to separate treatment related to such distinctions. Carriers may be treated as a separate class (compare *Seaboard Air Line* v. *Seegers,* 207 U. S. 73) and, as such, taxed differently or additionally. *Southern R. Co.* v. *Watts,* 260 U. S. 519, 530. This Court has approved the adoption of modes and methods of assessment and administration peculiar to railroads (*Kentucky Railroad Tax Cases,* 115 U. S. 321, 337), and upheld tax rates for railroads differing from those on other property, and as between railroad taxpayers, *Michigan Central R. Co.* v. *Powers,* 201 U. S. 245, 300; *Ohio Tax Cases,* 232 U. S. 576, 590; *Columbus & G. Ry. Co.* v. *Miller,* 283 U. S. 96. Similarly, we have explicitly recognized that a State may subject public service corporations to a special or higher income tax than individuals or other corporations. *Atlantic Coast Line R. Co.* v. *Daughton,* 262 U. S. 413, 424. The Corporation concedes this general right to set apart the utilities in New York for taxation.

The Corporation is brought within the purview of the Local Laws because "utility" is defined to include those "subject to the supervision of the department of public service." § 1 (e). It contends that classification in an

excise tax, however, should be made by specific reference to the character of the business to be taxed, and that it is arbitrary to make taxability depend on whether a person is subject to the supervision of a commission. Valid reason for the definition utilized appears from the fact that the Local Laws merely adopted the classification previously established in the New York Public Service Law (N. Y. Laws 1910, c. 480, as amended) which had selected those offering several kinds of public services, including the transportation of persons and property (§ 25),[3] and made them subject to the supervision of the department of public service.

Several reasons may be suggested for the selection for special tax burdens of the utilities embraced by the Local Laws under discussion. We mention a few. Those subject to the supervision of the department of public service are assured by statute that new private enterprises may not enter into direct competition without a showing of convenience and necessity for the public service[4] (see *New York Steam Corp.* v. *City of New York,* 268 N. Y. 137, 147; 197 N. E. 172). The Corporation suggests that the statute does not curb competition from the City's own rapid transit lines and from taxicabs. Freedom from unlimited, direct, private competition is of itself a sufficient advantage over ordinary businesses to warrant the imposition of a heavier tax burden. Reports which must be filed with the department of public service on the basis of approved systems of accounting suggest an administrative convenience in the collection and verification of the

---

[3] Others are the production and/or furnishing of gas, electricity, steam, and water, communication by telegraph or telephone, omnibus transportation. New York Public Service Law, §§ 64, 78, 89-a, 90, 60.

[4] New York Public Service Law (Laws 1910, c. 480), as amended: § 53 (railroad; street railroad); § 63-d (omnibus); § 68 (gas; electricity); § 81 (steam); § 89-e (water); § 99 (1) (telephone and telegraph).

tax [5] which might properly have been taken into account by the City's legislature. See *Carmichael* v. *Southern Coal & Coke Co.*, 301 U. S. 495, 511, and cases cited. The legislature may reasonably have conceived that the revenues of utilities furnishing indispensable services are subject to relatively little fluctuation, even in depression times, and reasonably have shaped its tax system accordingly.

*II. Discrimination.* The Corporation urges here, as the lower state courts held, that these general principles of classification are not effective to validate legislation where, as in these Local Laws, arbitrary, unreasonable and hostile discrimination against certain railroad companies is shown. This unlawful discrimination appears, because "they are," as the Corporation sees it, "in a far poorer position to bear the burden of unemployment relief than is business in general." Business may pass on taxes. Other utilities may apply to the commission and perhaps to the courts for an adequate rate increase. This Corporation cannot do so as by Contract No. 4 with the City it is bound to furnish transportation for a five-cent fare, which by City Charter provision cannot be changed without the approval of the proposal by a majority of the qualified voters, on referendum.[6] It is alleged in the complaint that rapid transit corporations are less able to pay a gross receipts tax than other utilities, whose

---

[5] Operating revenues are reported by railroads. See, e. g., Transit Commission, Summary of Reports of Rapid Transit, Street Surface Railway and Bus Companies operating in the City of New York for the Quarter April–June, 1935, and for the Fiscal Year Ended June 30, 1935; *Id.*, Quarter, April–June, 1936, and for the Fiscal Year Ended June 30, 1936.

[6] City of New York, Local Law No. 16 of 1925.

The argument is applicable in No. 436. There the limitation on fare exists in a franchise, alleged in the complaint to be beyond the regulatory power of the transit commission.

gross income yields a higher percentage of profit, that the operation and maintenance expenses of these corporations are higher in relation to gross receipts than those of other utilities, the ratio of net income to gross receipts, lower. It is said to be highly discriminatory to classify these railroads apart from other businesses, or in the same group as other utilities. The differences from business are not enough and from other utilities too great to justify this attempted classification, which sets them apart from business as a whole, and yokes them with other utilities.

The disadvantages complained of, as to fare limitations, are applicable only to the Corporation, a single member of a class of utilities. It is quite fortuitous that this particular corporation must seek adjustments in fare in a peculiar way. "The legislature is not required to make meticulous adjustments in an effort to avoid incidental hardships," see *Great Atlantic & Pac. Tea Co.* v. *Grosjean,* 301 U. S. 412, 424. "If the accidents of trade lead to inequality or hardship, the consequences must be accepted as inherent in government by law instead of government by edict." *Fox* v. *Standard Oil Co.,* 294 U. S. 87, 102.

In comparing its burdens with those of other utilities, the Corporation, by its argument, suggests that a gross receipts tax is invalid while a net income tax is valid. In taxing utilities as a class the legislature is not required to make "meticulous adjustments" for a particular sub-class of utility, see *Great Atlantic & Pac. Tea Co.* v. *Grosjean,* 301 U. S. at 424, *supra.* Moreover, while taxation of net income is apportioned to ability to pay, and is therefore "an equitable method of distributing the burdens of government," see *New York ex rel. Cohn* v. *Graves,* 300 U. S. 308, 313, it is not a compulsory method. There are other justifications for the gross receipts tax. Unconcerned

with disputes about permissible deductions, it has greater certitude and facility of administration than the net income tax, an important consideration to taxpayer and tax gatherer alike. And the volume of transactions indicated on the taxpayer's books may bear a closer relation to the cost of governmental supervision and protection than the annual profit and loss statement. · In *Clark* v. *Titusville*, 184 U. S. 329, we rejected an equal protection objection to a license tax on merchants, which we said (p. 334) was "a tax on the privilege of doing business regulated by the amount of sales, and . . . not repugnant to the Constitution of the United States." And we have heretofore had occasion to remark that gross receipts from an occupation constitutes an "appropriate measure of the privilege" of engaging in that occupation, *Western Live Stock* v. *Bureau of Revenue*, 303 U. S. 250; *American Manufacturing Co.* v. *St. Louis*, 250 U. S. 459, 463; *Maine* v. *Grand Trunk Ry. Co.*, 142 U. S. 217, 228.

Reliance is placed upon certain language of the opinion in *Stewart Dry Goods Co.* v. *Lewis*, 294 U. S. 550. But the tax on retailers held invalid in that case increased in rate with increasing volume. The Court said that the excise was laid upon the making of a sale, and that the statute "exacts from two persons different amounts for the privilege of doing exactly similar acts because the one has performed the act oftener than the other" (p. 566). For that reason it was thought necessary to inquire whether the tax could be justified as related to ability to pay, an inquiry we need not here pursue. The Court did not condemn a fixed-rate gross receipts tax, such as is involved in the present case. Indeed it suggested that the "desired end" might have been secured by the widely adopted "flat tax on sales" (p. 563), and indicated by way of contrast that though such a tax "would impose a heavier burden on the taxpayer having the greater volume

of sales" the graduated tax under consideration exacted not only a larger gross amount but one "larger in proportion to sales" (p. 564).

*III. Relation to Object of Legislation.* As a further ground for the invalidity of the Local Laws the Corporation urges that "the classification must rest upon some ground of difference, having a fair and substantial relation to the object of the legislation." It is asserted, and correctly so, that the Local Laws in question, as well as the state enabling statutes, show by their titles and content that the proceeds of the challenged taxes were for the relief of unemployment.[7] Violation of the rule invoked, it is asserted, occurs from the discrimination shown by the legislation in raising "a special fund for the particular purpose" from taxpayers no more responsible than others for the conditions. The Corporation seems to be of the opinion that no "state or city can, without conflict with the Constitution, adopt a tax statute, which states a specific object sought to be accomplished thereby and which at the same time puts the entire burden of the tax

[7] N. Y. Laws 1934, c. 873 (the enabling act):

"An Act to enable, temporarily, any city of the state having a population of one million inhabitants or more to adopt and amend local laws, imposing in any such city any tax and/or taxes which the legislature has or would have power and authority to impose to relieve the people of any such city from the hardships and suffering caused by unemployment and to limit the application of such local laws. . . .

"§ 2. Revenues resulting from the imposition of taxes authorized by this act shall be paid into the treasury of any such city and shall not be credited or deposited in the general fund of any such city, but shall be deposited in a separate bank account or accounts and shall be available and used solely and exclusively for paying the principal amount of any installment of principal and of interest due during the aforesaid period on account of the ten-year serial bonds sold to obtain moneys to pay for home relief and work relief in any such city in the month of November, nineteen hundred thirty-three, and for the relief purposes for which the said taxes have been imposed under the provisions of this act."

upon one particular class of business, even though that class is in no different position in relation to the object sought to be accomplished than business in general." The brief states the point to be "that there is a distinction between the ordinary excise tax with no specific purpose attached thereto, and a tax which is a part of a plan for the accomplishment of a specified object." The "object of the legislation," to the taxpayer, is apparently the relief of unemployment.

While, of course, the object of this legislation is in a sense to relieve unemployment, this is the object of the appropriation of the proceeds of the tax. The "object," as used in the rule and cases referred to by the Corporation, is the object of the taxing provisions, i. e., the raising of the money. If the designation of utilities as the only taxpayers under the legislation in question does not deny to them the equal protection of the laws, the fact that an appropriation of the funds for relief is a part of the legislation is not significant. "A tax is not an assessment of benefits." *Carmichael v. Southern Coal & Coke*

Local Law No. 21 of 1934, as amended by Local Law No. 2 of 1935:

"A local law to relieve the people of the city of New York from the hardships and suffering caused by unemployment and the effects thereof on the public health and welfare, by imposing an excise tax on the gross income of every person doing business within such city and subject to supervision of either division of the department of public service, and of any and all other utilities doing business within such city to enable such city to defray the cost of granting unemployment, work and home relief.

"§ 14. Disposition of Revenues.—All revenues and moneys resulting from the imposition of the taxes imposed by this local law shall be paid into the treasury of the city of New York and shall not be credited or deposited in the general fund of the city of New York but shall be deposited in a separate bank account or accounts, and shall be available and used solely and exclusively for the purpose of relieving the people of the city of New York from the hardships and suffering caused by unemployment, including the repayment of moneys borrowed for such purpose."

*Co.,* 301 U. S. 495, 522. Taxes are repeatedly imposed on a group or class without regard to responsibility for the creation or relief of the conditions to be remedied. *Idem,* note 14, p. 522. The *Carmichael* case involved a state act which levied a tax on employers of eight or more to provide unemployment benefits for workers employed by this class of employers. It was urged that the classification should have been based on the unemployment record of the employer, i. e., should have borne a relation to the object of unemployment relief. Against this contention, that there was no relation between the class of taxpayers and the purpose for which the fund was raised, this Court held that it is not necessary that there be "such a relationship between the subject of the tax (the exercise of the right to employ) and the evil to be met by the appropriation of the proceeds (unemployment)" p. 522. See also *Cincinnati Soap Co.* v. *United States,* 301 U. S. 308, 313. The Corporation suggests that in the *Carmichael* case there was a special relationship between the class taxed and the purpose for which the proceeds were spent, but the Court expressly said that this was something "the Constitution does not require" (p. 523). There need be no relation between the class of taxpayers and the purpose of the appropriation.

The cases cited by the Corporation to sustain its contention that classification must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, do not support the conclusion that the "object" referred to is the purpose for which the proceeds are to be spent. These authorities rather support the view that the "object" is the revenue to be raised by the acts. In *Colgate* v. *Harvey,* 296 U. S. 404, it was recognized that the classification "must rest upon some ground of difference having a fair and substantial relation to the object of the legislation" (p. 423) but it

was said (p. 424) that "the object of the act . . . simply is to secure revenue." In *Stebbins* v. *Riley,* 268 U. S. 137, *Royster Guano Co.* v. *Virginia,* 253 U. S. 412, and *Air Way Appliance Corp.* v. *Day,* 266 U. S. 71, the rule contended for by the Corporation was recognized but with no intimation that the "object" was considered to be the purpose for which the proceeds of the tax were spent. The "object" of the Local Laws under consideration, as in the case with most tax statutes, was obviously to secure revenue. In some cases a classification of taxpayers may be upheld as having a fair and substantial relation to a constitutional non-fiscal object (*Alaska Fish Co.* v. *Smith,* 255 U. S. 44, 48; *Quong Wing* v. *Kirkendall,* 223 U. S. 59, 62, 63; *Aero Mayflower Transit Co.* v. *Georgia Public Service Comm'n,* 295 U. S. 285, 291), but it is not constitutionally necessary that the classification be related to the appropriation. In *United States* v. *Butler,* 297 U. S. 1, also relied upon by the Corporation, the attack on the federal statute was successful because the tax was said to be a part of an unconstitutional scheme to regulate production through expenditures. It was not held invalid because there was no relation between the taxpayer and the appropriation. See *Cincinnati Soap Co.* v. *United States, supra.* We conclude, therefore, that the provisions of the legislation earmarking the funds collected are not of importance in determining whether or not the classification of the challenged acts is discriminatory.

What we have said in showing that the Local Laws do not deny the equal protection of the laws also disposes of the Corporation's contention that the Local Laws constitute a deprivation of due process, as being measured without regard to the net income of or ruinous effect on the taxpayers, and as laying on a particular class a burden which should be borne by all.

*IV. Contracts Clause.*[8]  The Corporation contends that, in contravention of the Constitution, Article 1, § 10, the Local Laws impair the obligation of the contract known as Contract No. 4, entered into March 19, 1913, between its predecessor and the City, under which it operates its owned and leased properties in New York.

By the terms of the contract, as summarized in the Corporation's complaint, the City agreed to construct certain rapid transit railroads, and the New York Municipal Railway Corporation, appellant's predecessor, agreed to contribute a portion of the cost of construction and to equip the railroads for operation. The latter further agreed to reconstruct and build additions to certain existing railroads, which it then had the right and duty to operate, so as to adapt them for operation in conjunction with the railroads to be constructed by the City. Under the terms of Contract No. 4, the City leased the railroads which it agreed to construct, and their equipment, which was to be furnished by the lessee, to the New York Municipal Railway Corporation, its successors and assigns, for a term of forty-nine years commencing on or about the first day of January, 1917, and the lessee agreed to operate said railroads to be constructed by the City in conjunction with the existing railroads as one system, and for a single fare not exceeding five cents.

The gross receipts of all the railroads combined from whatever source derived, directly or indirectly, were to be pooled. The City and its lessee were to share the receipts equally after the deduction of certain items provided in Article XLIX of Contract No. 4. It will suffice here if we summarize the provisions for deductions in

---

[8] In No. 436, the legislation is not challenged as an impairment of an obligation of contract. The Brooklyn and Queens Transit Corporation "does not operate under Contract 4, but under street railroad franchise from the City."

the language of appellant. The deductions were for the following purposes and in the following order:

"1. Rentals actually paid by Lessee under leases approved by the Commission;

"2. Taxes [The full provision as to 'taxes' is set forth later];

"3. Operating expenses exclusive of maintenance;

"4. Charges for maintenance of both the Railroad and the Existing Railroads [Railroad refers to the system to be constructed by the City; Existing Railroads refers to the company-owned lines as they existed at the time of execution of the contract];

"5. Charges for depreciation of the Railroad, the equipment, and the Existing Railroads;

"6. To be retained by the Lessee: ¼th of $3,500,000, representing the average income from operation of the Existing Railroads;

"7. To be retained by the Lessee: ¼th of 6% per annum on (a) the Lessee's contribution to cost of construction of the Railroad, (b) cost of equipment furnished by the Lessee, (c) cost of extensions and additional tracks constructed by the Lessee, and (d) cost of reconstruction of Existing Railroads (out of which quarterly payments the Lessee is required to amortize such costs);

"8. To be retained by the Lessee: ¼th of the actual annual interest payable by Lessee upon the cost of additional equipment, plus an amortization charge;

"9. To be paid to the City: ¼th of the annual interest payable by it upon its share of the cost of construction of the Railroad plus an amortization charge;

"10. To be paid to the City: ¼th of the annual interest payable by the City upon cost of construction of additions to the Railroad plus an amortization charge;

"11. 1% of the gross receipts, to be paid into a contingent reserve fund.

"In connection with the above allocation provisions, Contract No. 4 provided (Art. LI, p. 66) that if in any quarter the gross receipts should be insufficient to meet the various obligations and deductions above recited, the deficits should be cumulative, and payment thereof should be made in the order of priority above set forth."

The Corporation does not claim that Contract No. 4 exempts it or its property from taxation generally. It does assert that the City "may not, in the exercise of its governmental power, subject appellant to the payment of a tax on or measured by the gross receipts of the combined system of railroads," and that "by providing in specific terms for the disposition and allocation of the entire gross receipts, the parties necessarily precluded any kind of tax or charge by the City which would directly and specifically alter such disposition and allocation, to appellant's prejudice, except in so far as any such tax or charge may clearly be said to have been provided for in the contract provisions as to the disposition of gross receipts."

The Corporation further complains that the tax payments deprive it of "a substantial part of the interest and sinking fund allowance to which it was entitled" under deductions Nos. 7 and 8 set out above. The loss thus suffered was alleged to total more than $600,000.

We search in vain for any provision in the contract which expressly exempts the Corporation from payment of this tax, or indeed of any tax. Yet this is what is required before support can be obtained from the contracts clause. More than a hundred years ago it was stated by Chief Justice Marshall, in *Providence Bank* v. *Billings*, 4 Pet. 514, 563, that the taxing power is of such "vital importance" that "We must look for the exemption in the language of the instrument; and if we do not find it there, it would be going very far to insert it by construction." In *Erie Ry. Co.* v. *Pennsylvania*, 21 Wall. 492, 499, this Court said that "the language in which the sur-

render is made must be clear and unmistakable." At the present term, the Court has reiterated that contracts of tax exemption are "to be read narrowly and strictly," *Hale* v. *State Board,* 302 U. S. 95, 109. See also *Pacific Co.* v. *Johnson,* 285 U. S. 480, 491; *Puget Sound Power & Light Co.* v. *Seattle,* 291 U. S. 619, 627.

Not only is the Corporation unable to point to an unmistakable exemption, but the contract itself contains an express provision permitting the deduction of taxes from the gross receipts.[9] Its language is broad. It refers to "all taxes . . . of every description (whether on physical property, stock or securities, corporate or other franchises, or otherwise) assessed or which may hereafter be assessed against the Lessee in connection with . . . the operation of the . . . Railroads." The taxes under discussion clearly come within its terms.

It is alleged that at the time of the execution of the contracts, and prior to the passage of the state enabling acts,[10] the tax power of the City was confined to special assessments for public improvements, and ad valorem taxes on real estate and special franchises issued by the City. The Corporation insists that it was contemplated that no other type of tax would be assessed, and that it was not necessary to make provision for exemption since the Corporation was merely accepting the tax burden common to all owners of property. It is urged that the contract be interpreted from this point of view, and the

---

[9] The clause reads as follows: "Taxes, if any, upon property actually and necessarily used by the Lessee in the operation of the Railroad and the Existing Railroads, together with all taxes or other governmental charges of every description (whether on physical property, stock or securities, corporate or other franchises, or otherwise) assessed or which may hereafter be assessed against the Lessee in connection with or incident to the operation of the Railroad and the Existing Railroads. Also such assessments for benefits as are not properly chargeable to cost of construction or cost of equipment."

[10] See *supra* note 2.

provision limited to taxes of the type which the City could have imposed in 1913.

There is no reason to limit the ordinary meaning of words used in a contract by men prepared to invest under its terms. " . . . a business proposition involving the outlay of very large sums cannot be and is not taken by the parties concerned according to offhand impressions; it is scrutinized phrase by phrase and word by word." *New York* v. *Sohmer,* 237 U. S. 276, 284; cf. *Ohio Ins. Co.* v. *Debolt,* 16 How. 416, 435.

Where the intention was to prevent the imposition of new taxes, adequate language was available. The court below adverted to its opinion in *Brooklyn Bus Corp.* v. *City of New York,* 274 N. Y. 140; 8 N. E. 2d 309, where the contract entitled the corporation to a broader tax exemption because it provided that "any new form of tax or additional charge that may be imposed by any ordinance of the city or resolution of the Board upon or in respect of the franchise . . . shall be deducted from the compensation payable to the City hereunder . . . "

A similar suggestion that the contract be limited to the taxes known at the time of its making was urged upon us, and discarded, in *J. W. Perry Co.* v. *Norfolk,* 220 U. S. 472. Under a lease made by Norfolk in 1792, when Norfolk was a borough without power to tax, the lessee agreed to pay, in addition to rent, "the public taxes which shall become due on said land." The lessee sought to enjoin the collection of taxes in 1906 by the City of Norfolk, on the ground that the parties contemplated only taxes imposed by Virginia or the United States. This Court held that the language was broad enough to cover the city tax, saying (p. 480), that "the provision that the lessee was to 'pay public taxes' was sufficiently comprehensive to embrace municipal taxes whenever they could thereafter be lawfully assessed on land or the improve-

ments which were a part of the land. Where one relies upon an exemption from taxation, both the power to exempt and the contract of exemption must be clear. Any doubt or ambiguity must be resolved in favor of the public."

Admitting that with respect to a franchise contract silent as to taxes the city may validly impose a license tax on the privilege of doing business, since "surrender of the state's power to tax the privilege is not to be implied from the grant of it," *Puget Sound Power & Light Co.* v. *Seattle,* 291 U. S. 619, 627, it is urged by the Corporation that here the City is violating the affirmative covenants of a contract, namely, the provisions for allocation of revenue. The contention is made that these provisions preclude an "alteration" by virtue of a gross receipts tax.

This Court, in construing a contract to determine whether or not legislation is violative of its provisions within the meaning of the contract clause of the Constitution, will examine for itself the existence and meaning of the contract as well as the relation of the parties and the circumstances of its execution. *Appleby* v. *City of New York,* 271 U. S. 364, 379–380; *Funkhouser* v. *Preston Co.,* 290 U. S. 163, 167; *Violet Trapping Co.* v. *Grace,* 297 U. S. 119, 120. But of course in so doing we "lean toward agreement with the courts of the state, and accept their judgments as to such matters unless manifestly wrong," *Hale* v. *State Board,* 302 U. S. 95, 101; *Tampa Water Works Co.* v. *Tampa,* 199 U. S. 241, 243–244; *Southern Wisconsin Ry. Co.* v. *Madison,* 240 U. S. 457, 461. In this case the Court of Appeals of New York, 275 N. Y. 258, 268; 9 N. E. 2d 858, has determined that "the right to tax cannot be lost by such tenuous implication," i. e., on the theory that the tax enables the City to secure a portion of the gross income in contravention of the con-

tract. We see no reason for disagreeing with the conclusion of the Court of Appeals of New York upon this point.

In effect, the Corporation is urging that a constructive condition restricting the City's power of taxation should be incorporated in the contract, by speculation as to what the parties must necessarily have intended, despite the long standing rule that exemptions must be "clear and unmistakable." *Erie Ry. Co.* v. *Pennsylvania,* 21 Wall. 492, and other cases, all cited *supra.*

The Corporation professes to dread an interpretation of the contract and the legislation, which will put it "wholly at the mercy" of the City; under which the Corporation's gross receipts would be disposed of, not as Contract No. 4 provides, but as the City may from time to time in its wisdom determine." The Corporation is not deprived of its right to resist on constitutional or legal grounds whatever tax or assessment may be imposed upon it or its property. The City can not lay a gross receipts tax on the Corporation unless it selects a class of taxpayers which meets the requirement of the equal protection of the laws. The provisions of the contract as to taxes are certainly not sufficiently explicit to justify us in denying to the City the right to collect such taxes as those involved in this litigation. The danger which the Corporation sees from what it considers to be a violation by legislation of its contract rights is a danger which every utility, with a franchise which does not protect its property from additional taxation, must endure.

Convincing precedent for the contention of the City is found in *North Missouri R. Co.* v. *Maguire,* 20 Wall. 46, where this Court considered a statute of Missouri which provided that the railroad could issue bonds having priority over the State's mortgage. The Act made specific provision for the allocation of the earnings of the Railroad Company in much the same manner as Contract No. 4

does in the present case. The Act established a "fund commissioner" and provided that the railroad company should pay over to this commissioner "all the gross earnings and daily receipts." It was provided that the commissioner should first pay amounts required for "actual current expenditures"; should then make other specified deductions, and lastly, should apply any excess to certain first mortgage bonds and then against the railroad's debt to the State.

Subsequently the State Constitution was amended to provide that an annual tax of 10% of the gross receipts should be levied on the North Missouri Railroad Company and two other named corporations. The state court held that the earlier statute constituted a contract but considered the payment of taxes to fall within "current expenditures for carrying on the ordinary business." In this Court, the company argued that the tax constituted a violation of this contract, since it overturned the allocation of receipts and had the effect of converting the State from a junior creditor to a first mortgagee.

This Court agreed that "serious difficulty" would arise if "the ordinance was a mere change of the order of disbursing the receipts and earnings," instead of "an expression of the sovereign will of the people of the State levying taxes to pay and discharge the indebtedness of the State," but concluded that the tax actually imposed was proper. Of the provisions for allocation of the gross receipts, the Court said (p. 63):

"Further examination of those provisions is certainly unnecessary, as it is too plain for argument that they do not afford the slightest support to the views of the plaintiffs. On the contrary, they are entirely silent upon the subject of taxation, and fully justify the remarks of the State court when they say that the subject of taxation forms no part of the contract contained in the act under consideration.

"Nothing is said about taxation, and it does not seem to have entered into the contract between the parties, but was obviously left where the law had placed it before the act was passed, nor was any provision made for the payment of taxes unless it may be held that the disbursements for that purpose may fairly be included in such as are required to pay the current expenditures in carrying on the ordinary business of the corporation."

In our opinion, as the contract does not prohibit this tax, the legislation does not violate the contracts clause.

*Affirmed.*

MR. JUSTICE STONE and MR. JUSTICE CARDOZO took no part in the consideration or decision of this case.