(Nos. 61314, 61315, 61324 cons.—)
JOHN C. BOYNTON *et al.*, Appellees, v. STANLEY T. KUSPER, JR., County Clerk, *et al.*, Appellants.

*Opinion filed February 21, 1986.—Rehearing denied April 1, 1986.*

SIMON, J., took no part, having withdrawn.
MILLER and GOLDENHERSH, JJ., dissenting.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, Patricia Rosen, Assistant Attorney General, and Barbara L. Greenspan,

James C. O'Connell, Steven Hogroian, and James C. Stevens, Special Assistant Attorneys General, of Chicago, of counsel), for appellant Director of Public Aid *et al.*

Charles L. Barker, Hollis E. Wright and Joan S. Meier, of Jenner & Block, of Chicago, for appellant Illinois Coalition Against Domestic Violence.

Arnold M. Flamm, of Orlikoff, Flamm and Patner; Harry A. Young, Jr., of Neistein, Richman, Hauslinger & Young, Ltd.; and Robert D. Allison, all of Chicago, for appellees.

Candace Wayne, of Chicago, Barbara Hart, of Reading, Pennsylvania, and Judith Avner, of New York, New York, for *amicus curiae* National Coalition Against Domestic Violence *et al.*

Arlene C. Erlebacher and Anne E. Rea, of Sidley & Austin, and Kathleen C. Yannias, all of Chicago, for *amicus curiae* YWCA of Metropolitan Chicago *et al.*

Laurie Woods and Joanne Schulman, of New York, New York, and Aviva Futorian, of Chicago, for *amicus curiae* Jane Doe.

JUSTICE RYAN delivered the opinion of the court:

Plaintiffs, John C. Boynton, Kent Koplin, Marianne Lubke, and Joanne Simon, brought this class action against several Cook County and Illinois State officers to challenge the validity of section 3 of "An Act to provide for the fees of the *** county clerk in counties of the third class" (Ill. Rev. Stat. 1983, ch. 53, par. 73). The challenged statute required clerks in counties with a population exceeding one million to pay $10 of the $25 fee collected for issuing a marriage license into the Domestic Violence Shelter and Service Fund. (See Ill. Rev. Stat.

1983, ch. 40, pars. 2403, 2403.1.) Plaintiffs maintained that this portion of the license fee was an unconstitutional tax. The Illinois Coalition Against Domestic Violence was given permission to intervene as a defendant. On cross-motions for summary judgment, the trial court ruled for the plaintiffs, holding the challenged provision of the statute unconstitutional. The defendants appealed directly to this court pursuant to Supreme Court Rule 302(a) (94 Ill. 2d R. 302(a)). We consolidated defendants' appeals for this opinion.

The legislature, as part of its statutory scheme to combat domestic violence, passed "An Act in relation to domestic relations and domestic violence shelters and service programs" (hereinafter cited as the Domestic Violence Shelters Act). (Ill. Rev. Stat. 1983, ch. 40, par. 2401 *et seq.*) This act authorized the Department of Public Aid to "administer domestic violence shelters and service programs, or *** provide for their administration by not-for-profit corporations with whom the Department has contracts." (Ill. Rev. Stat. 1983, ch. 40, par. 2402.) Among other services, these shelters were to provide "temporary residential facilities to family or household members who are victims of domestic violence and their children." (Ill. Rev. Stat. 1983, ch. 40, par. 2401(c).) Funding for the shelters was to be provided by the Department from funds allocated to the Domestic Violence Shelter and Service Fund. Ill. Rev. Stat. 1983, ch. 40, par. 2403.

In conjunction with the passage of these provisions, the legislature increased the fee charged by a county clerk for the issuance of a marriage license in a third class county from $15 to $25. County clerks were specifically directed to pay the $10 increase into the Domestic Violence Shelter. and Service Fund. (Ill. Rev. Stat. 1983, ch. 53, par. 73.) A similar provision was enacted for fees charged for marriage licenses in counties of the first and

second class. (Ill. Rev. Stat. 1983, ch. 53, par. 35.) The statute has since been amended to raise the fee to $40, with $25 targeted for the funding of shelters and services for victims of domestic violence. Ill. Rev. Stat., 1984 Supp., ch. 53, pars. 35, 73.

Under the Domestic Violence Shelters Act, the county clerk deposits the designated portion of the marriage license fee with the county treasurer. The county treasurer remits the money to the State Treasurer on a monthly basis. The State Treasurer deposits "such amounts into the Domestic Violence Shelter and Service Fund in the State treasury." Ill. Rev. Stat. 1983, ch. 40, par. 2403.1.

In our case the four plaintiffs applied for marriage licenses in Cook County in February 1984. They were made aware that the cost of the license included the portion allotted to the Domestic Violence Shelter and Service Fund. Plaintiffs objected to the payment of this portion of the fee, but were informed that a license would not be issued unless the entire fee amount was paid. Plaintiffs paid the fee but filed a written protest with the county clerk regarding the portion designated for the shelters.

Plaintiffs filed this class action in February 1984 pursuant to sections 2—801 and 2—802 of the Civil Practice Law (Ill. Rev. Stat. 1983, ch. 110, pars. 2—801, 2—802). The trial court certified the cause as a class action. Plaintiffs attacked the statute as a violation of the due process guarantee of article I, section 2, of the Illinois Constitution of 1970. Plaintiffs also alleged that the statute violated article IX, section 2, of the Illinois Constitution, which provides that "[i]n any law classifying the subjects or objects of non-property taxes or fees, the classes shall be reasonable and the subjects and objects within each class shall be taxed uniformly. Exemptions, deductions, credits, refunds and other allowances shall

be reasonable."

On cross-motions for summary judgment, the trial court ruled in favor of the plaintiff class. The court found that it was bound by our decision in *Crocker v. Finley* (1984), 99 Ill. 2d 444, to find the statute unconstitutional as a violation of the due process guarantee of article I, section 2, of the Illinois Constitution of 1970.

The virtues of the domestic-violence shelter program are not at issue in this case. However, our duty to decide whether a statute is violative of a constitutional provision cannot be evaded or neglected no matter how desirable or beneficial the legislation may be. (*Grasse v. Dealer's Transport Co.* (1952), 412 Ill. 179, 190.) In considering the question before us we must be mindful of Justice Holmes' admonition in *Pennsylvania Coal Co. v. Mahon* (1922), 260 U.S. 393, 416, 67 L. Ed. 322, 326, 43 S. Ct. 158, 160, that "a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."

We are dealing in this case with a very sensitive and highly emotional issue. Plaintiffs, defendants, intervenor and *amici* have devoted a large portion of the briefs to the subject of wife beating and whether contemporary societal norms sanction such conduct. Similarly, a substantial part of the record below consists of statistical data, testimony of experts and publications. The thrust of much of this material is that there is a cause-and-effect relationship between marriage and domestic violence. Much of this material is irrelevant. Simply stated, the issue before us is whether our legislature may impose a "fee" upon a class of people based only on the fact that they have applied for marriage licenses, where the money collected is used to fund a general welfare program.

Since we are dealing here with the same sections of

the Domestic Violence Shelters Act, the same type of "fee," and the same type of limited classification of who must pay the fee, we agree with the trial court that our decision in *Crocker v. Finley* (1984), 99 Ill. 2d 444, is controlling in the present case.

In *Crocker*, the plaintiff class challenged the validity of a statute that required circuit court clerks to collect a special $5 filing fee from petitioners for dissolution of marriage "to fund shelters and other services for victims of domestic violence in Illinois." (99 Ill. 2d 444, 447-48.) The fee was collected to enable the Department of Public Aid to carry out the provisions of the Domestic Violence Shelters Act, the same statutory provisions involved here. See 99 Ill. 2d 444, 447-48.

Plaintiffs in *Crocker* alleged both that the provision conflicted "with the Illinois constitutional right to obtain justice by law freely" (*Crocker v. Finley* (1984), 99 Ill. 2d 444, 451) and that it violated the due process clause of the Illinois constitution (99 Ill. 2d 444, 456.) We recognized that the central issue in both contentions was whether the legislature could impose such a fee upon a limited group of plaintiffs where the funds collected went into the State Treasury to fund a general welfare program. 99 Ill. 2d 444, 451.

As to the first contention, this court found that the filing fee constituted a tax that unreasonably interfered with the plaintiffs' access to Illinois courts. (*Crocker v. Finley* (1984), 99 Ill. 2d 444, 455.) This finding alone would have been sufficient to render the statute invalid. (See 99 Ill. 2d 444, 451-52.) However, this court also discussed the plaintiffs' second allegation as a separate basis for invalidating the statute. The court recognized that whether the filing fee was imposed under the State's police power or the power to tax, it could not be imposed arbitrarily. (99 Ill. 2d 444, 457.) The court noted the issues of due process and equal protection were

"overlapping and intertwining" and that an arbitrary exercise of either the taxing power or the police power "is violative of due process, as well as equal protection, guaranteed by our Constitution. [Citation.]" 99 Ill. 2d 444, 457.

Based upon the facts that the services provided by the fees were "available to all adults and their dependents who are the subjects of domestic violence"; that there was "no requirement that recipients of the services be either married or divorced"; and that only those petitioning for dissolution of marriage were required to pay the fee, the statute was found "to be an *arbitrary use*" (emphasis added) of the State's power, "inconsistent with due process guarantees." *Crocker v. Finley* (1984), 99 Ill. 2d 444, 456.

The basic terms of the Domestic Violence Shelters Act have not changed since this court decided *Crocker*. (See 99 Ill. 2d 444, 447-51; Ill. Rev. Stat. 1981, ch. 40, par. 2401; Ill. Rev. Stat. 1983, ch. 40, par. 2401.) As defined in the Act, domestic violence may occur between any family or household member. (Ill. Rev. Stat. 1983, ch. 40, par. 2401(a).) A family or household member is defined as "a spouse, person living as a spouse *** or other adult person related by consanguinity or affinity, who is residing or has resided with the person committing domestic violence." (Ill. Rev. Stat. 1983, ch. 40, par. 2401(b).) Thus, the Act, as stated in *Crocker*, provides services to all adult citizens and their dependents who are victims of domestic violence, with no requirement that the adult recipients have any particular marital status. *Crocker v. Finley* (1984), 99 Ill. 2d 444, 456.

We recognized in *Crocker* that "a charge having no relation to the services rendered, assessed to provide general revenue rather than compensation, is a tax. [Citations.]" (99 Ill. 2d 444, 452.) Thus, the fee involved in that case was found to be a tax on litigation. The portion

of the marriage license fee in question here has no relation to the county clerk's service of issuing, sealing, filing, or recording the marriage license. Its sole purpose is to raise revenue which is deposited in the Domestic Violence Shelter and Service Fund (see Ill. Rev. Stat. 1983, ch. 53, par. 73) so that the Department of Public Aid can provide domestic-violence shelters and service programs. (See Ill. Rev. Stat. 1983, ch. 40, par. 2403). Thus, here, as in *Crocker*, this portion of the fee is a tax.

The tax imposed here, as in *Crocker*, is levied on only a narrow class of people who may or may not become eligible to be recipients of the benefits of the object of the tax. In *Crocker*, the legislature chose to tax only those persons seeking a dissolution of their marriages. (*Crocker v. Finley* (1984), 99 Ill. 2d 444, 456.) Other classes of litigants, equally eligible to receive the benefits of the shelters and the service programs, were not taxed. (See Ill. Rev. Stat. 1981, ch. 25, pars. 27.1, 27.2.) In this case, the tax has been placed only upon those single people who apply for marriage licenses. Other classes of people equally eligible to receive the benefits of the Domestic Violence Shelters Act are not assessed such a "fee." (See Ill. Rev. Stat. 1983, ch. 53, pars. 35, 73; Ill. Rev. Stat. 1983, ch. 127, par. 142b4). As noted, in *Crocker* this court, in addition to considering the question of a tax on litigation, considered the issues of due process and equal protection under the Illinois Constitution and under article IX, section 2, of our constitution, relating to classification for tax purposes. As stated above, we noted that there was a "certain overlapping and intertwining of the issues." (99 Ill. 2d 444, 457.) Although the same overlapping and intertwining may be found in this case, plaintiffs here have not raised an equal protection issue, and the primary thrust of the arguments of all the parties has centered on due process of

law under the Illinois Constitution. The trial court based its holding on the due process issue. We likewise will base our holding solely on the due process clause of this State's constitution (Ill. Const. 1970, art. I, sec. 2).

We noted above that much effort has been expended in this case in an attempt to establish a cause-and-effect relationship between marriage and domestic violence. The purpose was to establish a rational basis for imposing the tax upon the limited class of persons who are taxed under the statute in question and to establish a rational relation between the class taxed and the object of the legislation. In *Crocker* those seeking to uphold the tax likewise contended that there was a reasonable relation between the taxed class and the legislative purpose. (*Crocker v. Finley* (1984), 99 Ill. 2d 444, 455.) However, this court held that there was no rational basis for imposing the tax on only the narrow class of taxpayers selected under the Act. (99 Ill. 2d 444, 457.) The court stated that the relationship asserted is simply too remote. (99 Ill. 2d 444, 455.) The same reasoning is applicable to the class selected for taxation in this case, and the trial court properly held that the decision in *Crocker* was controlling.

As in *Crocker*, we consider the relationship between the purchase of the marriage license and domestic violence to be too remote to satisfy the rational-relation test of due process. This court has discussed the rational-relation test in different ways, all of which focus on essentially the same elements. In considering the reasonableness of a classification from a due process point of view, under either the police power or the taxing power of the State, "it must appear that the particular classification is based upon some real and substantial difference in kind, situation or circumstance in the persons or objects on which the classification rests, and which bears a *rational relation* to the evil to be remedied and

the purpose to be attained by the statute, otherwise the classification will be deemed arbitrary and in violation of the constitutional guaranties of due process and equal protection of the laws." (Emphasis added.) (*Grasse v. Dealer's Transport Co.* (1952), 412 Ill. 179, 193-94.) Assuming the existence of the serious problem of domestic violence (which is not disputed), the mere finding that it exists does not permit the adoption of arbitrary or unrelated means of meeting it. (*Heimgaertner v. Benjamin Electric Manufacturing Co.* (1955), 6 Ill. 2d 152, 159.) The due process clause of our constitution, insofar as it limits the exercise of the State's police or taxing powers, prohibits the arbitrary and unreasonable use of these powers. To be a valid exercise of the police power, the legislation must bear a *reasonable relationship* to the public interest to be served and the means adopted must be a reasonable method to accomplish such objective. (*Illinois Gamefowl Breeders Association v. Block* (1979), 75 Ill. 2d 443, 453; *Finish Line Express, Inc. v. City of Chicago* (1978), 72 Ill. 2d 131, 138; *Sherman-Reynolds, Inc. v. Mahin* (1970), 47 Ill. 2d 323, 327.) If a law bears a *reasonable relationship* to a proper legislative purpose and is not arbitrary or discriminatory, the requirements of due process are met. *S. Bloom, Inc. v. Mahin* (1975), 61 Ill. 2d 70, 77.

If the relation between the procurement of a marriage license and domestic violence were found to be sufficient to satisfy the requirements of due process, then, as noted in *Crocker* (99 Ill. 2d 444, 456), countless other social welfare programs would qualify for monies obtained by imposing a similar tax on those who apply for marriage license. Using the same cause-and-effect test that defendants would have us apply to the relation between marriage and domestic violence, other worthy social problems can be found that are just as closely and reasonably related to marriage as is domestic violence, if

not more so. Since *all* divorces involve people who have been married, why should not a marriage counseling program be financed by another tax on marriage licenses? Since most marriages produce children, why should we not defray certain educational costs by the imposition of yet another add-on tax to marriage licenses? Why should not such a tax be imposed for the maintenance of institutions for delinquent or neglected children, and why should not yet another tax be imposed to defray juvenile-probation costs? We conclude in this case that the imposition of a tax on the issuance of a marriage license does not bear a reasonable relation to the public interest sought to be protected by the Act in question and the means adopted, that is, the imposition of the tax on marriage licenses, is not a reasonable means of accomplishing the desired objective.

We have addressed the due process question only on the rational-relation basis. That was the basis of the trial court's holding and the primary thrust of the arguments in this court. However, plaintiffs have also urged that the "strict scrutiny" test be applied. Freedom to marry has been recognized as a fundamental right. In *Loving v. Virginia* (1967), 388 U.S. 1, 12, 18 L. Ed. 2d 1010, 1018, 87 S. Ct. 1817, 1824, the court held that marriage is one of the basic civil rights of man, fundamental to our very existence. (See also *Boddie v. Connecticut* (1971), 401 U.S. 371, 28 L. Ed. 2d 113, 91 S. Ct. 780.) Although marriage is a fundamental right, every regulation relating to the prerequisites for marriage is not necessarily subjected to the "strict scrutiny" test applicable to fundamental rights. Reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may be imposed. *Zablocki v. Redhail* (1978), 434 U.S. 374, 386, 54 L. Ed. 2d 618, 631, 98 S. Ct. 673, 681; *Califano v. Jobst* (1977), 434 U.S. 47, 54, 54 L. Ed. 2d 228, 235, 98 S. Ct. 95, 99; *Moran v.*

*Beyer* (7th Cir. 1984), 734 F.2d 1245, 1246-47.

Here, however, we are not dealing with an attempt to impose reasonable regulations upon those who desire to enter into the marriage contract. Nor are we concerned with a general State regulation or tax. Instead, by the statute in question the legislature has singled out marriage as a special object of taxation. In *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue* (1983), 460 U.S. 575, 75 L. Ed. 2d 295, 103 S. Ct. 1365, the Supreme Court found that a special tax which singled out the press as an object of taxation could not be countenanced unless the State showed a counterbalancing interest of compelling importance it could not achieve without the differential taxation. (460 U.S. 575, 585, 75 L. Ed. 2d 295, 305, 103 S. Ct. 1365, 1372.) We conclude that the same rationale must be applied to our case.

Here the imposition of the special tax upon the issuance of a marriage license imposes a *direct* impediment to the exercise of the fundamental right to marry and must be subjected to the heightened test of strict scrutiny and not to the lesser rational-relation test. When a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important State interests and is closely tailored to effectuate only those interests. (*Zablocki v. Redhail* (1978), 434 U.S. 374, 388, 54 L. Ed. 2d 618, 631, 98 S. Ct. 673, 682.) The classification in this case does not meet the strict-scrutiny test.

It may be argued that the amount of the tax imposed by the Act in question is nominal and does not therefore impose a significant interference with the fundamental right to marry. True, the tax in question is only $10. However, as noted earlier, the legislature has now increased the tax on marriage licenses to $25. Once it is conceded that the State has the *power* to impose a spe-

cial tax on a marriage license, that is, to single out marriage for special tax consideration, there is no limit on the amount of the tax that may be imposed. In *M'Culloch v. Maryland* (1819), 17 U.S. (4 Wheat.) 316, 428, 4 L. Ed. 579, 607, Chief Justice Marshall long ago stated that the power to tax may legitimately be exercised on the objects of taxation to the utmost extent to which the government may choose to carry it. This observation was followed by the famous statement that the power to tax involves the power to destroy. Thus, once we acknowledge the State's power to specially tax the issuance of marriage licenses, a significant interference with the fundamental right to marry has been established. As noted, the original tax here was only $10. It was then raised to $25, and if the legislature sees fit, this special tax may be increased to $100 or more to support this welfare program alone. Also, as previously noted, there are many other social problems that could also be addressed by imposing a special tax upon marriage licenses. We are not here concerned with the traditional political limitation on taxation referred to in *M'Culloch v. Maryland.* It is true that at some point political considerations will cause the legislature to limit the amount of the special tax it will impose upon the issuance of a marriage license. However, we are dealing here with a fundamental right, and long before political considerations limit the amount of this tax some people will be forced by the tax imposed to alter their marriage plans and will have "suffer[ed] a serious intrusion into their freedom of choice in an area in which we have held such freedom to be fundamental." (*Zablocki v. Redhail* (1978), 434 U.S. 374, 387, 54 L. Ed. 2d 618, 631, 98 S. Ct. 673, 681.) This court has noted that it has long been the standing policy of this State to foster and protect marriage. (*People v. Walker* (1951), 409 Ill. 413, 418.) The State has not demonstrated a compelling State interest

which will satisfy the strict-scrutiny test. We therefore conclude that the State may not impose the special tax in question. The judgment of the circuit court of Cook County is therefore affirmed.

*Judgment affirmed.*

JUSTICE SIMON took no part in this case, having withdrawn therefrom.

JUSTICE MILLER, dissenting:

Because I believe that the imposition of a $40 marriage license fee does not significantly interfere with a decision as important as whether to marry and that the legislature, in enacting the statute in question, could have found a reasonable relationship between the purposes of the Act and the means and the classification used to achieve those purposes, I dissent from the majority opinion.

A. Strict-Scrutiny Analysis

Although marriage undoubtedly is a fundamental right (see *Loving v. Virginia* (1967), 388 U.S. 1, 18 L. Ed. 2d 1010, 87 S. Ct. 1817), not every restriction on marriage is subject to strict-scrutiny analysis. "[R]easonable regulations that do not significantly interfere with decisions to enter into the marital relationship" may be imposed without rigorous scrutiny by the courts. (*Zablocki v. Redhail* (1978), 434 U.S. 374, 386, 54 L. Ed. 2d 618, 631, 98 S. Ct. 673, 681; *Moran v. Beyer* (7th Cir. 1984), 734 F.2d 1245, 1246-47.) I do not believe that a State's decision to impose a $40 fee on marriage licenses for the purpose, in part, of funding the Domestic Violence Shelter and Service Fund (Ill. Rev. Stat. 1983, ch. 40, par. 2403) significantly interferes with a decision to marry, and none of the parties contesting the fee raise that claim.

In *Califano v. Jobst* (1977), 434 U.S. 47, 54 L. Ed. 2d 228, 98 S. Ct. 95, the Supreme Court refused to review under the strict-scrutiny test a Federal statute providing that social security beneficiaries permanently lost their benefits if they married nonbeneficiaries. Beneficiaries retained their benefits, however, if they married persons who also received social security benefits. The court unanimously held that strict-scrutiny analysis was inapplicable to review of the Federal provision, even though some persons who might otherwise have married were deterred from marriage by the rule. The court found that the law terminating benefits upon marriage did not interfere with the individual's freedom to make a decision as important as the decision to marry. (434 U.S. 47, 54, 54 L. Ed. 2d 228, 235, 98 S. Ct. 95, 99.) For similar reasons, I do not believe that the fee imposed here should subject the statute in question to a strict-scrutiny analysis as a significant interference on the decision to enter into marriage.

Plaintiffs here do not allege that their decision to marry, or that of anyone else, was affected by the license fee. Rather, plaintiffs challenge only the use for which the fee was designated by statute. In contemplating marriage, few people consider how the State will appropriate their marriage license fee as a factor in their marriage decision. Certainly, a person's disagreement with how marriage license funds are to be disbursed by the State is not such a significant factor in the marriage decision as to constitute a direct impediment on the right to marry.

Although, as the majority points out, the power to tax is the power to destroy (*M'Culloch v. Maryland* (1819), 17 U.S. (4 Wheat.) 316, 428, 4 L. Ed. 579, 607), mere possession by the State of the power to tax marriage licenses does not, of itself, constitute an impediment to the right to marry. Rather, it is the exercise of

the taxing power in an oppressive manner which could impact upon the marriage decision. The Supreme Court, in *Zablocki v. Redhail* (1978), 434 U.S. 374, 386, 54 L. Ed. 2d 618, 631, 98 S. Ct. 673, 681, stated that strict scrutiny is not required of every regulation which affects marriage; rather, strict scrutiny is required only of those regulations which significantly interfere with the decision to enter into marriage. Strict scrutiny of a statute such as the one before us would be required only if the tax became burdensome to the point that it became a factor worthy of consideration to those deciding upon marriage. That claim has not been raised here.

## B. Rational-Relationship Standard

The majority concludes that no rational relationship exists between the marriage license fee and any legitimate legislative purpose, and that the tax violates principles of due process. I believe that plaintiffs' challenge to the statute invokes principles of equal protection separate from their due process claims. Nevertheless, for the reasons which follow, I would uphold the funding provisions of the Domestic Violence Shelters Act against both the due process and equal protection challenges to the statute.

### 1. Due Process

The requirements of due process are met if a law bears a reasonable relationship to a proper legislative purpose and is neither arbitrary nor discriminatory. (*Kidd v. Industrial Com.* (1981), 85 Ill. 2d 534; *Illinois Gamefowl Breeders Association v. Block* (1979), 75 Ill. 2d 443, 454.) The majority finds that imposing a tax on marriage licenses does not bear a reasonable relationship to a legitimate public interest, because the relationship between domestic violence and the procurement of marriage licenses was not conclusively established.

To comport with principles of due process, however, it is not necessary to establish a relationship between those who purchase marriage licenses and those who use the shelter program. For purposes of a due process, as opposed to an equal protection, analysis there need be no relation between the class of taxpayers and the purpose of the appropriation. (*New York Rapid Transit Corp. v. City of New York* (1938), 303 U.S. 573, 586, 82 L. Ed. 2d 1024, 1034, 58 S. Ct. 721, 728.) As the Supreme Court has explained,

"[T]here is no requirement under the Due Process Clause that the amount of general revenue taxes collected from a particular activity must be reasonably related to the value of the services provided ***:

'Nothing is more familiar in taxation than the imposition of a tax upon a class or upon individuals who enjoy no direct benefit from its expenditure, and who are not responsible for the condition to be remedied.

A tax is not an assessment of benefits. It is, as we have said, a means of distributing the burden of the cost of government.' "

(*Commonwealth Edison Co. v. Montana* (1981), 453 U.S. 609, 620, 69 L. Ed. 2d 884, 897, 101 S. Ct. 2946, 2955, quoting *Carmichael v. Southern Coal & Coke Co.* (1937), 301 U.S. 495, 521-22, 81 L. Ed. 1245, 1260-61, 57 S. Ct. 868, 878.)

This court has previously upheld tax statutes against constitutional attack where those who pay the tax are not the only beneficiaries of the tax revenues. See *Titus v. Texas Co.* (1973), 55 Ill. 2d 437 (statute upheld which taxed only gasoline-powered boats, although the tax proceeds benefited owners of sailboats and diesel-powered boats as well).

Under due process principles, the challenged law, rather than the burdened classification, must bear a reasonable relationship to a legitimate public interest, and the means adopted must be a reasonable manner of ac-

complishing the desired objective. In the present case, all parties have agreed that the shelter program is a laudable program and a legitimate object of legislative creation. A taxing statute is directly related to raising revenue (see *S. Bloom, Inc. v. Mahin* (1975), 61 Ill. 2d 70, 77); the statute at issue here, therefore, is rationally related to its purpose. Furthermore, in light of the following equal protection analysis, the means used, *i.e.*, taxing an identified class, is not arbitrary.

I find that the funding provisions of the Domestic Violence Shelters Act do not violate constitutional due process proscriptions.

## 2. Equal Protection

Under both the Federal and State constitutions, laws may treat differently persons who appear to be similarly situated if the legislative classification bears a rational relationship to a legitimate legislative purpose. (*Clements v. Fashing* (1982), 457 U.S. 957, 962-63, 73 L. Ed. 2d 508, 515, 102 S. Ct. 2836, 2843; *S. Bloom, Inc. v. Mahin* (1975), 61 Ill. 2d 70.) In taxation, even more than in other fields, legislatures possess the greatest freedom in classification. (*Lehnhausen v. Lake Shore Auto Parts Co.* (1973), 410 U.S. 356, 364, 35 L. Ed. 2d 351, 357, 93 S. Ct. 1001, 1006; *Doolin v. Korshak* (1968), 39 Ill. 2d 521, 528.) Classifications for purposes of taxation bear a strong presumption of constitutionality which can only be overcome "by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes." (*Lehnhausen v. Lake Shore Auto Parts Co.* (1973), 410 U.S. 356, 364, 81 L. Ed. 2d 351, 358, 93 S. Ct. 1001, 1006.) States are not required to convince the courts of the correctness of their legislative judgments. Rather, those challenging the legislative judgment must convince the court that the legislative facts upon which the classification is appar-

ently based could not reasonably be conceived to be true by the governmental decision maker. *Minnesota v. Clover Leaf Creamery Co.* (1981), 449 U.S. 456, 464, 66 L. Ed. 2d 659, 668-69, 101 S. Ct. 715, 724.

Equal protection and due process analyses are the same except that equal protection pertains to the basis of differentiation in a legislative classification. (See J. Nowak, R. Rotunda, and J. Young, Constitutional Law 585-86 (1983).) In the present case, the gravamen of plaintiff's complaint is that there are no grounds to distinguish or separate those who are taxed under the statute from others who are not taxed, with respect to the domestic-violence shelters program. If persons marrying in Illinois as a class have characteristics different than the general population with respect to domestic violence, then this difference provides a rational basis for the legislative classification challenged here.

The evidence is closely balanced as to whether the percentage of married persons who use the shelter program is higher than the proportion of married persons in the general population. Because of the strong presumption in favor of upholding taxpayer classifications, however, plaintiffs have the burden of showing that married persons as a class bear no greater relationship to the shelter program than does the general population.

There is evidence indicating that the percentage of married persons eligible to use the program is higher than the percentage of married persons in the general population. Defendants' sociological experts testified, for example, that serious violence occurs more often between family members, especially spouses, than between other individuals in society.

I believe that the legislature could have found that purchasing a marriage license provides a rational ground of classification upon which to base a tax supporting the shelter fund. This view is strengthened by the weighty

presumption of constitutionality which operates here with regard to taxpayer classifications.

I do not find constitutionally prohibitive the fact that only persons presently entering into marriage in Illinois are taxed by the marriage license fee. The legislature may implement its programs one step at a time. (*Minnesota v. Clover Leaf Creamery Co.* (1981), 449 U.S. 459, 466, 66 L. Ed. 2d 659, 670, 101 S. Ct. 715, 725.) Although only a small percentage of those persons who are now married in Illinois have paid the tax, the class would expand as the number of marriages celebrated after the effective date of the statute increased and, eventually, all of those persons who had been married in Illinois would have paid the tax to fund the shelter.

Finally, I do not believe that the result in *Crocker v. Finley* (1984), 99 Ill. 2d 444, controls the present case. In *Crocker*, the fee imposed on those seeking a divorce was found to be arbitrary. Unlike the present case, no evidence was presented in *Crocker* to establish a connection between those seeking a divorce and the incidence of domestic violence. It is difficult to equate those who are terminating the marital relationship with those who are entering into the relationship for purposes of analyzing the reasonable relationship between the marital state and domestic violence. In contrast to *Crocker*, evidence was adduced here to establish that the classification of those taxed was not arbitrary, which, taken with the presumption in favor of the classification, is enough to validate the classification.

For the reasons stated, I believe that the funding provisions of the Domestic Violence Shelters Act violate neither the due process nor the equal protection guarantees of the United States and Illinois constitutions. I would, therefore, uphold the statute against constitutional attack.

JUSTICE GOLDENHERSH joins in this dissent.