EMBRY, Justice
(dissenting).
I respectfully dissent. In my view, the Court of Civil Appeals, 471 So.2d 408, clearly made new findings of fact in the opinion below and thereby overturned the nonjury findings of the trial court without justification. Second, the Court of Civil Appeals has gone far beyond allowing the legislature broad discretion in tax classification schemes, to the extent of upholding any taxing scheme, regardless how arbitrary, regardless how capricious. Lastly, this case throws the holding in Delta Airlines v. Department of Revenue, Civil Action No. CV-80-116-6, ironically, a case upon which the Court of Civil Appeals relied, into serious question. Let the common carriers and energy producers of our nation be forewarned: the footing in Alabama is treacherous.
Colonial Pipeline Company (hereafter Colonial) petitions this court to review the *414 Alabama Court of Civil Appeals’ decision reversing a declaratory judgment entered by the Montgomery County Circuit Court arising out of an ad valorem tax assessment ruling by the Alabama Department of Revenue (hereafter the Department). The trial court found that the Department unlawfully assessed Colonial’s property as Class I property within the meaning of Amendment 373 to Section 217 of the Constitution of Alabama (1901). I would find that the assessment of Colonial’s property as Class I for ad valorem tax purposes is in violation of both the equal protection guarantees of the Fourteenth Amendment to the United States Constitution and Sections 1, 6, and 22 of the Alabama Constitution.
This ease was presented ore tenus and as such the trial court’s findings should not be disturbed, absent plain and palpable error. Ford v. Alabama By-products Corp., 392 So.2d 217 (Ala.1980). After a careful review of the entire record, I conclude that the trial court’s findings of fact are more than amply supported by the record and therefore must stand. The significant portions thereof are set out below:
“A. Findings of Fact
“1. History of Alabama’s Constitutional and Statutory Provisions.
“In 1935, the Alabama legislature enacted the predecessor of what is now § 40-21-1 of the Code of Alabama 1975. Section 40-21-1 provides that the Department shall assess for taxation the property of various taxpayers, including the property of pipelines transporting oil, gasoline or other commodities of commerce, as well as the property of all public service or public utility corporations. The section does not set, or attempt to set, the ratio to market value at which the property of a particular taxpayer will be assessed for ad valorem tax purposes. The section simply provides that the property of such taxpayers will be centrally assessed by the Department, rather than being locally assessed by the tax assessors of the various counties. At the time of its enactment, the purpose of § 40-21-1 was to provide a convenient, uniform and fair assessment of the property of taxpayers engaged in multi-county and multi-state operations, and the Department acknowledges that § 40-21-1 was not a taxing statute. The. Department readily admits that § 40-21-1 requires the central assessment of both utility and non-utility taxpayers.
“Until 1972, central assessment, as opposed to local assessment, was of no significance in determining a taxpayer’s ad valo-rem tax liability. Central assessment was primarily a matter of convenience for both the Department and taxpayers. Although the property was assessed by the Department, the tax was paid directly to the counties based on an apportionment of the assessed property values among the appropriate counties by the Department. The ratio of assessed value to market value for property which was centrally assessed was exactly equal to the ratio of the assessed value to market value for property which was locally assessed. The rate of tax was likewise the same for centrally assessed property and locally assessed property. This uniformity of taxation for all property was required by Sections 211 and 217 of the Alabama Constitution.
“In 1972, however, Section 217 of the Alabama Constitution was amended by the passage of Amendment 325. Amendment 325 provided for the division of all taxable property within the State of Alabama into three classes for the purposes of ad valo-rem taxation. The amendment further provided differing ratios of assessment to be applied to each of the three classes of property. In pertinent part, Amendment 325 provided as follows: *415 shall be forever taxed at the same rate, and such property shall be assessed for ad valorem tax purposes according to the classes thereof as herein defined at the following ratios of assessed value to the fair and reasonable market value of such property:
*414 “(a) All taxable property within this state, not exempt by law, shall be divided into the following classes for the purposes of ad valorem taxation:
“Class I. All property of utilities used in the business of such utilities. “Class II. All property not otherwise classified.
“Class III. All agriculture, forest and residential property.
“(b) With respect to ad valorem taxes levied by the State, all taxable property
*415 “Class I. 30 per centum
“Class II. 25 per centum
“Class III. 15 per centum
“(c) With respect to ad valorem taxes levied by counties, municipalities or other taxing authority, all taxable property shall be forever taxed at the same rate, and such property shall be assessed for ad valorem tax purposes according to the classes of property defined in paragraph (a) herein and at the same ratios of assessed value to the fair and reasonable market value thereof as fixed in paragraph (b) herein....”
Although the adoption of Amendment 325 brought to an end the requirement of absolute uniformity in the taxation of all property, the uniform taxation of all property within the same class was still required by the Alabama and United States Constitutions.
“The clear and unambiguous language of Amendment 325 provided that Class I property consisted only of ‘property of utilities used in the business of such utilities.’ The constitutional amendment did not designate which taxpayers constituted utilities, nor did it define ‘property of utilities.’ However, in 1973, the Alabama legislature enacted § 40-8-1 of the Code of Alabama 1975 purporting to implement the provisions of Amendment 325. In defining Class I property, § 40-8-l(a) merely tracks the language of the constitutional amendment and defines Class I property as ‘property of utilities used in the business of such utilities.’ Section 40-8-l(b)(l), however, defines the ‘property of utilities’ as ‘[a]ll property assessed for taxation by the department of revenue pursuant to the provisions of [§ 40-21-1].’ Consequently, § 40-21-1 was converted from a statute designed to promote uniformity and fairness in the taxation of property, to a taxing statute by reference only.
“As stated, § 40-21-1 requires the central assessment of the property of numerous taxpayers which are not utilities. Therefore, the property of numerous non-utilities is presently being assessed as Class I property, rather than as Class II property, in direct contradiction to the Alabama Constitution. Despite this fact, the Department has done nothing to assess as Class I property only the property of those taxpayers which are centrally assessed and which are also utilities. The Department has taken the position that if a taxpayer is centrally assessed under § 40-21-1, its property constitutes Class I property whether or not the taxpayer is a utility. This position has been taken by the Department despite the clear language of Amendment 325 which defined Class I property solely as the ‘property of utilities used in the business of such utilities.’
“Section 217 of the Alabama Constitution was further amended in 1978 by the passage of Amendment 373. As a result of Amendment 373 to the Alabama Constitution, there are now four classes of property, rather than three classes. Class I property is still defined as the ‘property of utilities used in the business of such utilities,’ and is still to be assessed at a ratio of 30 percent of market value. Class II property retains its definition as ‘[a]ll property not otherwise classified,’ but it is now assessed at a ratio of only 20 percent of market value.
“After the adoption of Amendment 325 in 1972 and the enactment of implementing legislation, Colonial, as well as other non-utility taxpayers which were centrally assessed by the Department, had their property assessed at 30 percent of market value as Class I property, rather than at 25 percent of market value as Class II property. Consequently, these non-utility taxpayers paid ad valorem tax equal to 120 percent of the amount they would have paid if their property had been assessed as Class II commercial property.
*416 “In 1978, however, the burden of being taxed as a utility became much greater. After the adoption of Amendment 373, the property of utilities was still assessed at a ratio of 30 percent of market value as Class I property, but other commercial property was assessed at a reduced ratio of only 20 percent of market value as Class II property. As a result, the property of non-utilities which was centrally assessed was effectively taxed at a rate equal to 150 percent of the rate imposed on the property of non-utilities which was locally assessed.
“2. Description of Colonial.
“Colonial is engaged in the interstate transportation of refined petroleum products by pipeline to and through the State of Alabama, among other points, in a 14-state region. The property of Colonial which is subject to ad valorem tax in the State of Alabama consists primarily of pipelines and operating tankage, all being dedicated to, and used solely and exclusively in, interstate commerce. Colonial does not own any of the refined petroleum products which it transports through its pipelines, nor does Colonial sell any refined petroleum products for its own account or for the account of others. Therefore, Colonial is a transportation company merely providing one alternative mode of transporting petroleum products.
“Colonial’s pipeline system begins in the Houston, Texas, area and terminates in the New York City metropolitan area. Approximately two percent of the total refined petroleum products transported by Colonial are delivered to points in the State of Alabama, but no product in the Colonial System originates in Alabama. Refined petroleum products delivered by Colonial to Alabama constituted 28.6 percent of the total refined petroleum product utilized in Alabama during 1980, and 34.3 percent of the product utilized in Alabama during 1981. The remaining percentage of refined petroleum products utilized in Alabama was delivered by modes of transportation in competition with Colonial.
“3. Colonial is Not treated as a Utility by Any Other Alabama Statute.
“Colonial does not pay, nor has the Department sought to impose, the public utility license tax imposed by § 40-21-50 of the Code of Alabama 1975, the utility gross receipts tax imposed by § 40-21-80 of the Code of Alabama 1975, or the utility service use tax imposed by § 40-21-100 of the Code of Alabama 1975. Moreover, the Alabama Public Service Commission has never asserted jurisdiction over Colonial pursuant to either § 37-2-1 et seq. or § 37-4-1 et seq. of the Code of Alabama 1975, or any other provision of the statutes of the State of Alabama.
“4. Colonial is Not Subject to ‘Utility ’ Type Regulation by any Federal Agency.
“Commencing with the passage of the Hepburn Act in 1906, common carrier pipelines transporting crude oil and refined petroleum products have been subject to federal regulation. The regulation of both crude oil and product pipelines is substantially identical; therefore, future reference will be made to them jointly as ‘oil pipelines.’ The Interstate Commerce Commission (“ICC”) exercised jurisdiction over oil pipelines from 1906 to 1978, at which time jurisdiction was transferred to the Federal Energy Regulatory Commission (“FERC”). The purpose of the 1906 regulation of oil pipelines was to assure independent producers and refiners of petroleum fair access to the pipelines owned by integrated oil companies, such as Standard Oil. The focus of oil pipeline regulation has not been the protection of the consumer of petroleum products which is in marked contrast with the focus of the regulation imposed on utilities, such as electric and telephone companies. It is noted that the ultimate consumer is affected very little by the transportation rates charged by oil pipelines. Typically, the cost of transporting gasoline by pipeline ranges from approximately one to two cents a gallon, or roughly one to two percent of the price of gasoline at the pump. Therefore, oil pipeline charges do not have a significant impact on consumers.
The 1906 statute requires that oil pipeline rates be just and reasonable, and for *417 bade undue preference and prejudice between shippers of petroleum products in the utilization of the pipelines. However, there has never been any federal control over ‘entry’ into the oil pipeline business, either for the movement of crude oil or refined product. Therefore, an oil pipeline has absolutely no regulatory protection from competition by newly-constructed pipelines since a new, competing pipeline can be constructed without the necessity of any regulatory approval. Likewise, there is no federal regulation on the ‘exit’ or termination of an oil pipeline. That is, an oil pipeline can terminate services, in whole or in part, without receiving any regulatory approval.
“While the 1906 statute requires that oil pipeline rates be ‘just and reasonable,’ neither the ICC nor FERC has been disposed to examine such rates pipeline-by-pipeline, point-to-point. Instead, they have left the setting of rates to competition and bargaining between the pipeline operators and their commercial customers. The regulators have set overall industry maximum rates of return, but have refrained from becoming involved in the details of specific pipeline rates. This low-level involvement in the regulation of oil pipeline rates is to be contrasted with the rate regulation imposed on utilities, such as electric and telephone companies. When an electric or telephone company proposes a change in its rates, its application is examined in depth and usually made the subject of hearings at which the cost of service is probed, customer class by customer class, and rate levels and rate relationships are reviewed. In short, utility rate regulation is meticulously detailed and repetitive from case to case, as contrasted to the almost nonexistent rate regulation of oil pipelines.
The regulation of utility rates must necessarily focus on the ultimate consumer of the utility service because this regulation is the only protection the consumer has from the monopolistic status of the utility. However, in exchange for this extensive rate regulation, utilities are guaranteed a certain rate of return on their investment. On the other hand, consumers of refined petroleum products need no protection from the rates charged by oil pipelines because the pipelines do not enjoy monopolistic status nor are they guaranteed a certain rate of return on their investment.
Within the broad industry guidelines set by the ICC, and now FERC, oil pipelines set their rates just as any other business. Rates are based on the cost of providing competitive restraints. Once rates have been established, they are published in a tariff which is filed with FERC. These rates go into effect automatically unless a formal complaint is filed with FERC with respect to such rates. Harry B. Greene, Administrator-Property Tax of Colonial, testified that there has never been a shipper complaint filed with either the ICC or FERC with respect to a Colonial rate. He further testified that all Colonial rates have been allowed to go into effect without a formal hearing and without change.
“Regulation in and of itself is not determinative of utility status. Only certain types of regulation are common to public utilities. Utility regulation is designed to protect the ultimate consumer through detailed regulation of rates and required approval of the utility’s entry into or exit from a market area. In short, utility regulation is a substitute for competition. The regulation of utilities must be accompanied by certain rights and privileges bestowed upon the utility. Utilities, for example, are protected from competition and are at least granted quasi-monopoly status. Conversely, the regulation of oil pipeline rates is minimal, and oil pipelines are not subject to entry or exit regulation. Oil pipelines are not granted any monopolistic position with respect to their service area, nor are they protected in any way from competition by other pipelines or other transportation modes.
“Although oil pipelines were granted the ability to acquire right-of-way condemnation in Alabama in 1973, Colonial has never utilized, nor sought to utilize, this right. Colonial acquired all of its right-of-way in *418 the State of Alabama through negotiation. ...

“5. Colonial is Subject to Intense Competition.
“As stated, oil pipelines are not granted a monopolistic position with respect to their service areas and are not protected from competition. The classic example of the competition to which oil pipelines are subject is the competition between Colonial and Plantation Pipe Line Company (‘Plantation’), which operate parallel product pipelines from the Gulf Coast to the Eastern Seaboard. During the 1950’s Plantation exclusively served this route. However, following the completion of the larger, more-efficient Colonial system in the early 1960’s, Plantation was forced both to reduce its rates and to expand capacity to remain competitive. Although Colonial’s rates were uniformly lower than Plantation’s when the Colonial system was first built and remained that way for a number of years, at present the point-to-point rates of Plantation are oftentimes lower than Colonial’s rates. This is a prime example of the effect of competition on oil pipeline rates by another common carrier which is free to enter the market at any point without regulatory approval.
“In addition to head-to-head competition from other pipelines, Colonial also faces competition from alternative sources of supply of a petroleum product for its market area and from crude oil pipelines. Moreover, Colonial faces substantial inter-modal competition from coastal tankers and intercoastal barges. The distribution of petroleum products transported through the Colonial system via distribution pipelines is also subject to substantial competition from trucklines. It is noted that none of Colonial’s intermodal competitors are utilities, and none are taxed as such by the Department.
“6. Comparison of Colonial’s Regulation With the Regulation of Other Carriers.
“Prior to 1980, railroads were intensely and broadly regulated by the ICC. With the enactment of the Staggers Act in 1980, some deregulation of railroads is now taking place; however, a substantial degree of regulation remains. The ICC retains control over a railroad’s entry into or exit from a particular market area. The ICC also must approve the acquisition or merger of railroads. In addition, the ICC has remained very active in the regulation of railroad rates even after partial deregulation.
“As the result of the Motor Carrier Act of 1980, the trucking industry has moved toward reduced or ‘revised’ regulation, to be distinguished from deregulation. ICC control over entry into new markets was eased, but permission is still required, and the ICC must make specific case-by-case findings as to the impact of a grant of new authority on existing carriers. Likewise, ICC control over the abandonment or exit from a market has been eased, but its authority still remains. A zone of freedom has been established for the trucking industry within which rate changes may be made free from regulation; however, outside this zone, rates remain subject to ICC regulation.
“Prior to September, 1982, the regulation of interstate business was very extensive. The Bus Regulatory Reform Act of 1982 sought to place greater reliance on competition and bring about reduced regulation, as distinct from deregulation. The applicable entry or exit standards were eased, but ICC approval is still required in order to enter a new market or exit from an existing market. As with the trucking industry, bus carriers have been given a zone of freedom within which they may set rates free from regulation; however, outside this zone, rates are still subject to regulation.
“The ICC has exercised broad regulatory authority over common carrier barge service since 1940. This regulation remains essentially unchanged to date.
“The deregulation of air transportation for both passenger and cargo service clearly has gone further than that of the rail, *419 truck, bus or water carrier industries. Control over entry and exit has now been eliminated for practical purposes. The airlines also are now free to set rates as they wish. In many respects, the regulatory posture of air transportation has now been placed on a par with that which has long been characteristic of the oil pipelines, i.e., competition is now relied upon rather than regulation of entry, exit and rates. However, airlines are still not quite as free from regulation as oil pipelines. The Federal Aviation Administration continues to control the number of permissible operations, i.e., arrivals and departures, at major airports. Therefore, even though an airline is free to begin service to a new market area, if there is insufficient capacity at the airport serving that area, the airline cannot commence service.
“7. Colonial Is Not Required to Serve the Public to Any Greater Extent Than Other Common Carriers.
“This Court finds that Colonial is under no greater obligation to serve the public than are other common carriers. In fact, due to the ‘batching’ requirements of Colonial, it serves a very limited ‘public’ which is not indicative of utility status.”
“8. There is No Reasonable Distinction Between Oil Pipelines and Other Common Carriers Upon Which to Base the Different Tax Treatment.
“Oil pipelines, together with a single barge company, are the only common carriers the property of which is assessed by the Department as Class I property. The sole reason advanced by the Department for the different treatment of these taxpayers and other common carriers such as trucklines, buslines or airlines, is that the property of pipelines and bargelines is centrally assessed by the Department because of their enumeration in § 40-21-1, whereas, the property of the other common carriers is not centrally assessed by the Department. Mr. Barber has testified that oil pipelines are less regulated than railroads, trucklines and buslines, even after the deregulation of these carriers. Further, Mr. Barber testified that oil pipelines are no more regulated than airlines after their deregulation, and are probably less regulated due to the airport capacity regulation of the Federal Aviation Administration....” (Footnotes omitted.)
The dispositive issue presented is whether the Department’s assessment of Colonial’s property as Class I utility property for purposes of ad valorem taxation denies Colonial the equal protection of the laws as guaranteed by the United States and Alabama Constitutions.
The Fourteenth Amendment to the United States Constitution guarantees that no state shall “deny to any person within its jurisdiction the equal protection of the laws.” For over a hundred years, the United States Supreme Court has interpreted the “equal protection clause” to mean that “no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in the same place and under like circumstances.” Missouri v. Lewis, 11 Otto 22, 101 U.S. 22, 31, 25 L.Ed. 989 (1880). Alabama’s Constitution offers similar equal protection guarantees through a combination of Sections 1, 6, and 22. Black v. Pike County Commission, 360 So.2d 303 (Ala.1978); City of Hueytown v. Jiffy Chek Co., 342 So.2d 761 (Ala.1977).
It is beyond dispute that the equal protection clause applies to the exercise of a state’s taxing powers, regardless whether the exercise is “occasioned by express terms of a statute or by its execution through duly constituted agents.” Weissinger v. Boswell, 330 F.Supp. 615, 622 (M.D.Ala.1971) (quoting Sunday Lake Iron Co. v. Township of Wakefield, 247 U.S. 350, 352, 38 S.Ct. 495, 495, 62 L.Ed. 1154 (1918)). The powers of the state are constitutionally restricted where the state attempts to impose upon members of a particular class a burden which is not shared by other members of that class. Allied Stores of Ohio, Inc., v. Bowers, 358 U.S. 522, 79 S.Ct. 437, 3 L.Ed.2d 480 (1958); Hartford Steam Boiler Inspection & Insurance Co. v. Harrison, 301 U.S. 459, 57 S.Ct. 838, 81 L.Ed. 1223 (1937). On this *420 point the Supreme Court has confirmed that:
“the equal protection clause means that the rights of all persons must rest upon the same rule under similar circumstances ... and that it applies to the exercise of all the powers of the state which can affect the individual or his property, including the power of taxation....”
Louisville Gas and Electric Co. v. Coleman, 277 U.S. 32, 37, 48 S.Ct. 423, 425, 72 L.Ed. 770 (1928).
This is not to say that the Equal Protection Clause mandates any rigid rule of uniformity of taxation. It is inherent in the state’s power to tax that it be free to select the subjects of taxation, and to grant exemptions. Carmichael v. Southern Coal and Coke Company, 301 U.S. 495, 57 S.Ct. 868, 81 L.Ed. 1245 (1937). In this respect, Congress, as well as state legislatures, have been afforded the widest of possible latitudes in selecting persons or property to be taxed. Steward Machine Co. v. Davis, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937); Thomasville Automotive Parts v. United States, 429 F.Supp. 133 (M.D.Ga. 1976). Consequently, a state’s exercise of the power to tax is presumed constitutional. Howell v. Malone, 388 So.2d 908, 911 (Ala.1980).
Nevertheless, there is a point beyond which that state may not go without violating the Equal Protection Clause. The state must proceed on a rational basis and cannot resort to palpably arbitrary classifications. Allied Stores of Ohio, Inc. v. Bowers, 358 U.S. 522, 527, 79 S.Ct. 437, 440, 3 L.Ed.2d 480 (1958). Where a state law discriminates in favor of a certain class, the discrimination must be “founded upon a reasonable distinction, or difference in state policy.” Kahn v. Shevin, 416 U.S. 351, 355, 94 S.Ct. 1734, 1737, 40 L.Ed.2d 189 (1974).
This court has also recognized the “rational basis” test. See Gideon v. Alabama State Ethics Commission, 379 So.2d 570 (Ala.1980). Under this test, the judicial inquiry becomes:
“ ‘(a) Whether the classification furthers a proper governmental purpose, and (b) whether the classification is rationally related to that purpose.’ ”
Howell v. Malone, 388 So.2d 908, 911 (Ala.1980) (quoting Gideon v. Alabama State Ethics Commission, 379 So.2d 570 (Ala.1980)). Of course the burden of proving the unconstitutionality of a particular taxing scheme rests with the party attacking the legislation. Howell v. Malone, 388 So.2d 908, 911 (Ala.1980).
In this case, it is incumbent upon Colonial to negate every conceivable basis which might support assessing its property as Class I utility property while assessing property of other common carriers at a lower rate. Lehnhausen v. Lakeshore Auto Parts Co., 410 U.S. 356, 364, 93 S.Ct. 1001, 1006, 35 L.Ed.2d 351 (1973).
The classification of properties for purposes of varying ad valorem tax rates, under Amendment 373 to the Alabama Constitution, undoubtedly serves a proper governmental purpose. Taxes are a legitimate means by which to distribute the costs of government. Apportioning a greater share of governmental costs to those who enjoy the use of public property or special franchises has been recognized as a proper governmental purpose. See Rapid Transit Co. v. New York, 303 U.S. 573, 58 S.Ct. 721, 82 L.Ed. 1024 (1938). In fact, this court expressly upheld Alabama’s taxing scheme, as set out by Amendment 373, in Howell v. Malone, 388 So.2d 908 (Ala.1980).
Colonial concedes the right of the state to discriminate against taxable entities based upon a valid governmental purpose where the enacted legislation is rationally related to that purpose. Nevertheless, Colonial argues that the inclusion of its property as Class I property is not rationally related to any state interest, but rather, is arbitrary and capricious. To support this argument, Colonial offers evidence proving that the properties of similarly situated, and competing taxpayers, specifically, other common carriers, are classified as Class II property.
*421 The trial court found that there was “no rational basis, nor any rational distinction related to the utility classification which would justify treating an oil pipeline differently for tax purposes than any other kind of common carrier transportation company.” After a careful review of the record, I am in agreement with the trial court.
The equal protection clause tolerates classifications in taxation so long as those common to a class share an equal burden. Allied Stores of Ohio, Inc. v. Bowers, 358 U.S. 522, 79 S.Ct. 437, 3 L.Ed.2d 480 (1958). It is in a case such as this one, however, where a classification imposes a more onerous burden upon one member of a class than that which is placed upon others similarly situated, that invidious and intolerable discrimination occurs.
Colonial is in a highly competitive market with its chief competitors being other pipelines, coastal tankers, barges, railroads, and trucks. However, evidence produced at trial established that properties of interstate buslines, trucklines, airlines, and water carriers are all classified as Class II property, and therefore taxed at a substantially lower rate than that of Colonial. In fact, oil pipelines, in addition to a single barge company, are the only common carriers whose properties are assessed as Class I property.
Thus, the proper judicial inquiry becomes whether the assessment of Colonial’s property as Class I property, while simultaneously assessing property of other common carriers at a lower rate, is rationally related to a proper governmental purpose.
In order to address this inquiry, I turn now to the numerous justifications, raised by the Department, which allegedly warrant this discriminatory tax treatment.
The Department argues, and the Court of Civil Appeals agreed, that the discriminatory tax treatment imposed upon Colonial is essentially the result of compliance with federal legislation which prohibits a state from assessing the property of railroads or motor carriers at a rate in excess of other commercial property rates. See 49 U.S.C. § 11503.
This argument loses its force in light of the fact that 49 U.S.C. § 11503 was not enacted until 1980. However, properties of motor carriers, such as truck lines and buslines, have been assessed as Class II property since the initial enactment of Amendment 325 in 1972. Thus, the property of motor carriers had received favorable tax treatment in Alabama for eight years prior to the enactment of the federal legislation. Such federal legislation cannot be said to retroactively justify the discriminatory tax treatment existing prior to its enactment.
In a similar argument, the Court of Civil Appeals noted that the Department is prohibited from assessing property of airlines as Class I property under the Montgomery County Circuit Court ruling in Delta Airlines v. Department of Revenue, Civil Action No. CV-80-116-6. In that case, the court found that property of airlines could not be classified as Class I property because airlines were not utilities as that term is used in Amendment 373. The court reasoned that there was no rational basis for distinguishing between airlines and competing common carriers for ad valorem tax purposes. Such a case can hardly serve as the basis for a classification of Colonial as a utility. To the contrary, it adds further support to Colonial’s contention that no rational basis exists for treating its property differently from that of other common carriers with which it competes in the petroleum transportation industry.
Neither may such discriminatory tax treatment be justified on “administrative” grounds. The Department argues that because property of Colonial is centrally assessed, under Code 1975, § 40-20-1, as opposed to that of other common carriers, which is assessed locally, administrative convenience justifies discriminatory tax treatment. As did the trial court, I would find that central assessment, in and of itself, provides no basis for varying ad valo-rem tax rates between common carriers. This court has previously recognized that central assessment serves a purpose of pro *422 viding a procedure for the fair and uniform assessment of property integrated into one operating system or unit which is located in numerous Alabama counties. State v. Alabama Power Co., 254 Ala. 327, 339, 48 So.2d 445 (1950). While such a purpose justifies different modes of taxation amongst members of a class, it does not justify the taxation of property centrally assessed at a higher rate than property locally assessed.
Lastly, the Department relies heavily upon the case of Howell v. Malone, 388 So.2d 908 (Ala.1980), as authorizing an assessment of Colonial’s property at a higher rate than that of other common carriers. In Malone, this court upheld, against a constitutional attack, the assessment of “one-family-owner-occupied residential property” at a lower rate than other residential property.
.The classifications in Malone were based upon the presumed use of the property, which this court found to be rationally related to a proper governmental purpose. Noting that the property classifications reflected the social and economic beliefs of the legislature, this court stated:
“The taxing scheme in question places a greater tax burden on those who are using their residential property for income-producing purposes. This is rational. The discrimination can be justified on the basis that the government is either providing more governmental services, on the one hand, or, on the other hand, is interested in relieving the tax burden on specified property owners to further some social or economic policy.” Id., 388 So.2d at 914.
In contrast to the scenario in Malone, Colonial’s property may not be distinguished by use from the property of other common carriers in the oil and gas transportation business. Neither may it be said, under the facts presented, that the government provides more services to Colonial than to other common carriers, or that some social policy is furthered by taxing Colonial at a higher rate than its competitors.
Based upon the foregoing, I conclude that there is no rational basis for taxing Colonial’s property as Class I property, while taxing that of other competing common carriers as Class II property. As the trial "court adeptly noted, “the legislature has attempted to provide a detailed definition of a phrase used in the Alabama Constitution generally descriptive of a class of property by incorporating by reference a longstanding statutory provision, the purpose of which has no relation to the classification scheme now mandated by the Constitution.” Consequently, I would hold that Colonial, by having its property assessed as Class I property of a utility within the meaning of Amendment 373, to Section 217 of the Constitution of Alabama, has been denied the equal protection of the laws guaranteed by the United States and Alabama Constitutions. Accordingly, I would reverse the judgment of the Court of Civil Appeals.
FAULKNER and ADAMS, JJ., concur.