(No. 72842.—

RONALD B. GRAIS, Appellant, v. THE CITY OF CHICAGO *et al.*, Appellees.

*Opinion filed October 1, 1992.*

198

O'Keefe, Ashenden, Lyons & Ward, of Chicago (Kevin M. O'Keefe and Mark R. Davis, of counsel), for appellant.

Kelly R. Welsh, Corporation Counsel (Lawrence Rosenthal, Benna Ruth Solomon and Brian Trubitt, of counsel), and Frederick J. Artwick and Lisa A. Hausten, of Sidley & Austin, all of Chicago, for appellees.

CHIEF JUSTICE MILLER delivered the opinion of the court:

Plaintiff, Ronald B. Grais, owner of several parcels of commercial real estate in the central area of Chicago, filed an action in the circuit court of Cook County chal-

lenging the constitutionality of several Chicago city ordinances. These ordinances create a special service area in central Chicago and levy taxes on commercial property in that area to fund the design and construction of the "Central Area Circulator," a new public transportation system for central Chicago. The parties stipulated to the facts and filed cross-motions for summary judgment. The trial judge denied Grais' motion and granted the city's motion, declaring the ordinances to be constitutional. Grais appealed directly to this court pursuant to Supreme Court Rule 302(b) (134 Ill. 2d R. 302(b)).

## Facts

The circulator project began with a study by the city's department of public works in 1986. The department recommended determining whether a light rail or trolley system would be feasible for the central area. In 1987, the Regional Transportation Authority sponsored a similar study by the Metropolitan Planning Council. In December 1989, the Metropolitan Planning Council issued a final report recommending a light rail transit system.

The Metropolitan Planning Council report noted that about 850,000 people enter the central area every weekday and that the need for improved transportation was the result of substantial growth in the central area. Specifically, the report noted: office space in the central area has doubled in the past 20 years; 18,000 housing units have been added since 1980; there has been a significant increase in retail activity; and there have been more than 4,000 new hotel rooms added recently. The report also predicted that the central area's growth was likely to continue with a similar increase in office space and almost 40% more downtown jobs by the year 2010. The report estimated that about 72,000 people would use the circulator system each day. Of these, 23,000 would be

transferring to or from CTA service, 17,000 would be transferring from Metra commuter train service, 28,000 would be midday travellers (mostly downtown workers travelling to lunch or shopping), and 4,000 would be central area residents commuting to work within the downtown area.

In January 1990, the Chicago department of planning issued a "Project Scoping Report" for the circulator project. The report warns that the development of Chicago's central area can continue only if the transportation system is improved. No major expansion of the downtown transit system has been made since the 1950s, while jobs in the central area have continued to increase. The report states that there were more than 630,000 jobs in the central area in 1980, and that there are projected to be more than 870,000 by 2010. The report warns that growing traffic makes the downtown area more expensive and less desirable as a business location, and that the job-growth predictions cannot be met without improving the downtown transit system. The scoping report does not identify specific routes or stops for the proposed circulator system, but does identify priority corridors by which the system will link important parts of the central area, including Union and Northwestern stations, Navy Pier, North Michigan Avenue, and McCormick Place. It also identifies four important land-use to land-use linkages the circulator would be designed to serve: (1) employment to shopping, restaurants, personal services and cultural activities; (2) trips between financial, legal, corporate and government offices; (3) hotel to convention center and visitor activities; (4) central area residential to employment. The report estimates that by 2010, the ratio of workers to residents in these corridors will be 832,000 to 99,500, or about 8 to 1.

The actual transportation system to be used by the Central Area Circulator has not yet been determined,

but a light rail or trolley system, a bus system, or a combination of the two are being considered. The cost of the system will be shared equally by the Federal government through the Urban Mass Transportation Administration, the State of Illinois, and the City of Chicago through the special service area tax.

To begin to implement the ideas presented in the various studies, the Chicago city council passed several ordinances. On October 31, 1990, the city passed an ordinance (the Notice Ordinance) that provided for a public hearing before the city council finance committee concerning the establishment of the special service area and provided for mailed and published notice of the hearing. (Notice Ordinance §2.) Notices were mailed to the owners of 4,929 parcels of real estate subject to the special service area tax and the hearing was held as scheduled on November 26, 1990.

On February 6, 1991, the city council passed the "Establishment Ordinance," establishing the special service area, and the "Governance Ordinance" creating the "Central Circulator Board" to assist the mayor and city council in administering the project. The Establishment Ordinance provides for the levy of an annual tax beginning in 1991 on property within the special service area at a maximum rate of 0.175% of the equalized assessed value of the property. The Establishment Ordinance also authorizes bonds to be issued in an amount up to $300 million, and for a maximum tax rate of 0.25% if such bonds are issued. The city has not yet exercised the authority to issue bonds. Finally, on July 24, 1991, the city enacted the 1991 Levy Ordinance, calling for a $14 million levy for the 1991 tax year.

The Notice and Establishment Ordinances define the special service area as:

> "the territory located within the following described perimeter:

Oak Street between Lake Michigan and La Salle Street;

La Salle Street between Oak Street and Ohio Street;

Ohio Street between La Salle Street and Kingsbury Street;

Kingsbury Street between Ohio Street and Grand Avenue;

Grand Avenue between Kingsbury Street and Des Plaines Street;

Des Plaines Street between Grand Avenue and Polk Street;

Polk Street between Des Plaines Street and State Street;

State Street between Polk Street and the Stevenson Expressway (Interstate 55);

The Stevenson Expressway (Interstate 55) between State Street and Lake Park Avenue;

Lake Park Avenue between 25th Street and 26th Street;

26th Street (extended) from Lake Park Avenue to Lake Michigan; and

Lake Michigan between 26th Street (extended) to Oak Street,

but not including any property which is classified from time to time as residential within the Cook County Real Property Classification Ordinance ***.'' Notice Ordinance §1(h); Establishment Ordinance §4.

Under the Cook County real property assessment ordinance, property in classes 2 (single family dwellings), 3 (multiunit residential property), and 9 (low and moderate income housing) would not be included in the special service area and therefore would not be subject to the tax.

Based on 1988 tax data, the special service area perimeter contained 14,191 parcels, comprising 34.3% of the total tax base of the city. While only 34.7% of the parcels within the perimeter were classified as nonresidential, that property constitutes 91.6% of the equalized assessed value of the area. Had the ordinances not ex-

cluded residential property from the special service area, 8.4%, or $1,176,196, of the initial $14 million levy would have been paid by owners of residential property.

In the Establishment Ordinance, the city council made numerous findings upon which it based its decision to exclude residential property from the special service area including the following:

"d) The vast majority of the Area is zoned for commercial uses;

e) The central area of the City has undergone in recent years very substantial development and expansion. Approximately 550,000 persons come to that area to work each day. Within the central area, areas of high growth have emerged and major commercial developments are under way, but these areas are not conveniently connected either to major transportation lines that converge in the core of the central area or other major downtown employment and major activity centers;

f) The total amount of office space in the central area has doubled since 1970;

g) As a result of the development and expansion of the central area of the City, the Area is in need of additional public transportation facilities and services. A public transportation system and facilities for the Area, including public transportation vehicles and lines (such as for light rail, bus, or other transportation modes), stations, and related facilities (the 'Central Area Circulator') will provide increased ability of persons to reach workplaces, offices, public buildings, services, and shops in the Area; will facilitate commerce and services in the Area; and will reduce air pollution. The development and operation of the Central Area Circulator for the Area will stimulate economic development, the maintenance and creation of jobs, the creations of additional tax revenues, and the general economic health of the Area;

h) Better transit circulation in the central area will encourage people to make longer trips by unifying the area into a coherent whole, allowing access to jobs that were not convenient to them and encouraging shoppers

and diners to venture further within the core of the central area during lunch and in the evening;

i) Business and commercial enterprises choose their location in large part on the basis of whether basic infrastructure, including mass transit, continues to work well;

j) The service lines for the Central Area Circulator will be located near major retail, hotel and other business and commercial expansion and development in the central area;

k) The placement of the service lines of the Central Area Circulator near major retail, hotel and other business and commercial activities is expected to generate measurable monetary benefits to the activities, including appreciation in commercial land value, ability to command premium lease rates, increased retail sales activity and increased commercial and hotel occupancy rates;

l) Historically, the implementation and presence of mass transportation systems in cities throughout North America, such as the Buffalo Metro Rail, Portland Metropolitan Area Express, Denver 16th Street Mall, San Diego Trolley, San Francisco Municipal Railway and Boston Light Rail System have all positively influenced the commercial activities along their corridors, as evidenced by significant growth and other increased levels of commercial activity;

m) The development and operation of the Central Area Circulator for the Area, and the services described generally in Section 4 of this Ordinance, will provide special governmental services to the Area in addition to those services provided generally throughout the City, all within the meaning of the Special Service Area Act; and

n) The provision of the special governmental services will be predominately and disproportionately for the benefit of the property in the area; residential property within the outer perimeter of the Area will be only indirectly and generally benefitted." Establishment Ordinance §2.

Because the ordinances describe the territory to be excluded from the special service area as property which is "classified from time to time as residential," the

scheme set up by the city contemplates that the special service area will change periodically as certain parcels change classifications. These changes would appear to occur from year to year without following the procedures for enlargement and disconnection set out in the Special Service Area Tax Act (Ill. Rev. Stat. 1989, ch. 120, pars. 1308 through 1309a). The taxing scheme is further complicated by the fact that some parcels of real estate have multiple classifications. Where a parcel has multiple classifications, the special service area tax is to be levied on the nonresidential component of the property. If the county clerk is unable to determine the nonresidential component, the inclusion of the property in the special service area is to be determined by its major classification under the Classification Ordinance. 1991 Levy Ordinance §5.

Grais makes three basic challenges to the Special Service Area Ordinances. First, he alleges that the ordinances violate article IX of the Illinois Constitution, which requires uniformity of property taxes, limits classification of real estate, and limits the types of real estate that can be exempted from taxes. (Ill. Const. 1970, art. IX, §§4(a), (b), 6.) Second, Grais claims that the ordinances violate the constitutional guarantees of due process and equal protection. (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §2.) Finally, Grais alleges that the ordinances violate several provisions of the Special Service Area Tax Act (Ill. Rev. Stat. 1989, ch. 120, par. 1300 *et seq.*).

## Discussion

As a preliminary matter, we observe that because the city's taxing scheme calls for a special service area which may fluctuate from year to year, Grais charges that the city's scheme as a whole creates an unauthorized classification system. Because the ordinances have

severability clauses, however, we will address the valid-
ity of the special service area in two separate questions.
First, can the city establish a special service area with
the boundaries specified? Second, can the city vary the
boundaries of the special service area from year to year
as the ordinances provide?

Grais' first claim is that the boundaries of the special
service area violate the uniformity clause of article IX of
the Illinois Constitution (Ill. Const. 1970, art. IX, §4(a)).
The uniformity clause provides that "taxes upon real
property shall be levied uniformly by valuation ascer-
tained as the General Assembly shall provide by law."

This court has previously recognized, however, that
special service area power (Ill. Const. 1970, art. VII,
§6(l)(2)) represents "a departure from the requirement of
uniformity in the 1870 constitution [citation], and its pur-
pose was to authorize local-government units to tax dif-
ferent areas within their boundaries at different rates as
the services furnished to those areas required." (*Oak
Park Federal Savings & Loan Association v. Village of
Oak Park* (1973), 54 Ill. 2d 200, 204.) Indeed, if complete
uniformity of property taxes were required, it would be
impossible for local governments to create special service
areas.

Grais nonetheless argues that the provisions of article
IX, section 10, of the 1970 Constitution provide evidence
that the separate uniformity provision of article IX, sec-
tion 4, predominates over the special service area power
of article VII. (Ill. Const. 1970, art. VII, §6(l).) We dis-
agree. Article IX, section 10, provides that article IX "is
not qualified or limited by the provisions of article VII of
this Constitution concerning the size of the majorities in
the General Assembly necessary to deny or limit the
power to tax granted to units of local government." This
provision refers to article VII, section 6(g), which re-
quires a three-fifths majority of the General Assembly to

deny or limit certain taxing powers of home rule units. The three-fifths majority provision of article VII, section 6(g), however, does not apply to the special service power found in article VII, section 6(l). Section 6(l) provides that "[t]he General Assembly may not deny or limit the power of home rule units" to create special service areas. (Ill. Const. 1970, art. VII, §6(l).) Therefore, it is clear that article IX, section 10, cannot apply to the special service area power. Because article IX, section 10, does not apply to the special service area provisions of article VII, article IX, section 10, provides no evidence that the uniformity provision of article IX, section 4, predominates over the article VII special service area power. We therefore conclude that the city's boundaries for its special service area are not invalidated by the uniformity clause of article IX.

Grais next argues that the city's special service area violates article IX, section 6, of the Illinois Constitution, which limits the types of property that may be exempted from taxes. This argument results from Grais' mistaken assumption that the perimeter boundary represents the real "boundary" of the special service area. Grais argues that residential property within the perimeter is not being taxed, and is therefore being exempted from the tax. The city, however, has defined the special service area as property within the perimeter that is not residential. Residential property has therefore been excluded from the special service area and not exempted.

As we have seen, the uniformity and exemption provisions of article IX do not prevent the city from drawing the special service area to exclude residential property. Nevertheless, the city's scheme must still be permitted under the article VII special service area power for the special service area to be valid. Article VII, section 6(l), provides:

"The General Assembly may not deny or limit the power of home rule units *** (2) to levy or impose additional taxes upon areas within their boundaries in the manner provided by law for the provision of special services to those areas and for the payment of debt incurred in order to provide those special services." Ill. Const. 1970, art. VII, §6(l)(2).

The language of section 6(l) was the result of a compromise among the members of the Local Government Committee at the 1970 Constitutional Convention. The language originally proposed was: "A unit of local government may levy or impose taxes differentially as provided by general law for the performance of special services and for the payment of debt." (7 Record of Proceedings, Sixth Illinois Constitutional Convention 1579 (hereinafter Proceedings).) Several delegates objected that the term "differentially" was unclear and questioned whether it allowed the classification of real estate. (4 Proceedings 3145.) The term "subordinate taxing areas" was suggested as a substitute (4 Proceedings 3146). But several delegates objected to the term "subordinate taxing area." Delegate Johnson stated that "we want to stay away from the word 'area' or 'district' to give the impression of a different taxing area. All we are doing is allowing differential taxes for the services received." 4 Proceedings 3147.

A debate then ensued as to whether the term "area" was exclusively a geographical concept. Delegate Parkhurst stated, "We are trying to talk in terms of a differential or a difference in taxes within a given area. *** We are talking about rates. We are not talking about geography." (4 Proceedings 3148.) Delegate Tomei, however, stated, "It seems to me that *** we *are* dealing with a matter of geography ***." (Emphasis in original.) (4 Proceedings 3148.) After negotiations, the Committee proposed to replace "differentially" with "additional

taxes upon areas within such unit." (4 Proceedings 3363.) Delegate Parkhurst explained that "it might still be defective, in that you don't really impose taxes on areas; you impose taxes on people or on property. You do it within areas—'additional taxes upon areas within such units.' " (4 Proceedings 3363.) Nevertheless, when asked whether "areas" meant geographical areas only, Delegate Parkhurst responded: "geographical areas only." (4 Proceedings 3363.) The amendment ("additional taxes upon areas within such unit") was then adopted and sent to the Committee on Style and Drafting. The language finally adopted by the convention ("additional taxes upon areas within their boundaries") was a result of revisions by the Committee on Style and Drafting.

While the debates show that there was considerable confusion about the meaning of the word "area," it is clear that there is a significant geographical component to its meaning. The question is whether the term connotes a strictly contiguous geographical area sufficient to invalidate the loosely contiguous boundaries the city has drawn.

We observe here that our appellate court in *Hiken Furniture Co. v. City of Belleville* (1977), 53 Ill. App. 3d 306, has answered this question in the negative. In *Hiken*, the city had created a special service area to fund a mall to improve the atmosphere in a commercial section of the city. The special service area was defined as a rectangular section of the city, but included only commercial property within that section. Residential properties and three industrial properties were excluded. The court observed that "the emphasis of the constitutional grant of power is that the tax should be borne by the property benefitted without regard to contiguity ***." (*Hiken,* 53 Ill. App. 3d at 310.) The court concluded that "the property benefitted should bear the burden of the cost of the special service received," and that the city's determina-

tion that commercial property will be immediately and directly benefitted was reasonable. *Hiken,* 53 Ill. App. 3d at 311.

As in *Hiken,* we believe that a unit of local government may consider circumstances other than geography in creating a special service area. We decline to require a more strict concept of contiguity for several reasons. First, as we have seen, some of the delegates at the constitutional convention considered the special service area power to allow "differential taxes for the services received" (4 Proceedings 3147), implying that considerations of which property benefits the most are as important as geographical considerations. While other delegates considered the special service area to be a strictly geographical concept, it is not clear that they believed that a strict contiguity requirement was a part of that concept. Contiguity was never discussed in the debates. Second, the special service area power was designed to give local governments more flexibility; a requirement of strict contiguity would tend to hinder that goal. Finally, in general, the powers of home rule units are to be liberally construed. (Ill. Const. 1970, art. VII, §6(m).) For all these reasons, we conclude that while the term "area" does include a geographical component, this does not prevent the city in this case from determining what property within the central area will benefit most from a special service and including only that property in the special service area, as long as that determination is reasonable.

In this case there is ample evidence to support the Chicago city council's finding that commercial property will benefit most directly from the proposed Central Area Circulator. Residential property may also benefit from the circulator. The circulator will allow many central area residents to move around that area more easily. Nevertheless, the studies have shown that the vast ma-

jority of the circulator's riders will be employees and customers of businesses in the central area. It does not directly benefit residents of the central area for these employees and customers to have better access to the central area. It does, however, directly benefit the central area businesses. Not only will those businesses have access to a larger labor pool, but many consumers who previously found it too inconvenient to get to the central area may start to patronize those businesses. In addition, there is evidence that improved transportation is essential for the expansion of central area business activity. Considering these facts, we believe that the city council could reasonably find that commercial property will benefit more directly from the circulator than residential property.

Grais also argues that under article IX of the constitution and section 162 of the Revenue Act of 1939 (Ill. Rev. Stat. 1989, ch. 120, par. 643), the principle of uniformity applies within the special service area and requires that all property in the special service area be taxed at the same rate. We need not decide whether uniformity is required within special service areas, however, because the city's scheme does tax all property inside the special service area at a single rate. Grais argues that the tax is not uniform within the special service area first because the residential property within the perimeter is not taxed and second because under the city's scheme, parcels with multiple classifications will be taxed at a different rate than parcels that are completely commercial.

We have dealt with Grais' first argument under the discussion of exemption. We point out again that residential property is not in the special service area and therefore need not be taxed at the same rate as property inside the area. The ordinances define the special service area as "not including any property which is classified

from time to time as residential." Neither the Establishment nor the Governance Ordinances contained specific provisions for property with multiple classifications. The 1991 Levy Ordinance, however, does contain such a provision.

> "No Special Service Tax shall be levied upon any taxable property located in the Area which is classified from time to time as residential property or classified as the residential component of a non-residential property within the Classification Ordinance. In the event the County Clerk is unable to determine the non-residential component of specific parcels based upon the permanent real estate index numbers provided to it by the County Assessor, the inclusion of the property in the Area shall be based on the major classification of such property under the Classification Ordinance." (1991 Levy Ordinance §5.)

The 1991 Levy Ordinance makes it clear that only the commercial portions of property with multiple classifications are considered to be in the special service area. The commercial portions of property with multiple classifications are taxed at the same rate as other property in the special service area. If the county clerk is unable to determine the nonresidential component of a parcel, the inclusion of that parcel in the special service area is based on the major classification of the property under the classification ordinance. If the parcel is included in the special service area, it is taxed at the same rate as all other property. We therefore conclude that under the city's scheme, the taxes within the special service area are uniform.

Grais also claims that the city's method of taxing property with multiple classifications would necessitate extensive programming changes in the computer system used by the county clerk, assessor and treasurer. While programming changes may be necessary, those changes do not affect the constitutionality of the city's scheme.

Grais next argues that the special service area ordinances violate the requirements of equal protection and due process under the State and Federal Constitutions (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §2). In particular, Grais claims that owners of property outside the perimeter and residential property inside the perimeter should share in the cost of the circulator because providing public transportation is a general function of government, and because all the property will benefit from the special service.

Grais cites *Boynton v. Kusper* (1986), 112 Ill. 2d 356 and *Crocker v. Finley* (1984), 99 Ill. 2d 444, for the proposition that it is unreasonable to burden a narrow section of taxpayers to fund a general function. We do not believe these cases are applicable here. Both cases involve attempts by the General Assembly to implement a tax to fund shelters for victims of domestic violence. In *Boynton* the tax was on marriage licenses, and in *Crocker* the tax was on court filing fees for divorce cases. In neither case was it clear that most of the people taxed would benefit from the service provided and the service was available to all people, whether or not they paid the tax. Here, however, Grais does not allege that there is any property in the special service area that will not be benefitted, in fact it seems clear that all the property will be benefitted, both because of added accessibility and possibly by rising commercial property values.

In *Coryn v. City of Moline* (1978), 71 Ill. 2d 194, this court decided the proper standard for equal protection and due process challenges to special service areas. There the court held that "[u]nder the equal protection and due process clauses of the constitutions of Illinois and the United States there need only be a rational basis for taxing a given area for a given 'special service' ***." (*Coryn,* 71 Ill. 2d at 202.) We believe the city has met

this standard. It is true that residential property will be benefitted to some extent by the circulator, and that in the case of mixed-use property the city's scheme does not separate commercial and residential property perfectly. For example, some residential property in parcels with multiple classifications may be subject to the tax if the county clerk is unable to apportion the tax and the parcel's major classification is commercial. But absolute precision is not required, only reasonableness. (See *Titus v. Texas Co.* (1973), 55 Ill. 2d 437, 442.) As we noted earlier, there is sufficient evidence to support the city council's finding that commercial property will be disproportionately benefitted by the circulator. Furthermore, there is no evidence that significant amounts of residential property within the perimeter will be taxed or that significant amounts of commercial property within the perimeter will escape taxation because of difficulties with multiple classifications. Therefore we conclude that the ordinances do not violate equal protection or due process.

The *Coryn* court, however, went on to say that units of local government are not "free to gerrymander the boundaries of special service areas to maximize revenues, without regard to whether there is a rational relationship between the property taxed and the property served." (*Coryn*, 71 Ill. 2d at 202.) Grais claims that such gerrymandering has occurred in this case because while only 34.7% of the parcels within the perimeter are being taxed, those parcels make up 91.6% of the value within the perimeter. We disagree. We believe that the gerrymandering referred to by the *Coryn* court would occur if the city included property in the special service area only for the purpose of increasing the tax revenues, even though that property was not in need of and would not benefit from the service provided. Grais does not al-

lege that the commercial property being taxed here would not benefit from the Central Area Circulator.

Grais argues, however, that under the uniformity clause a higher standard should apply. Grais notes that in *Searle Pharmaceuticals, Inc. v. Department of Revenue* (1987), 117 Ill. 2d 454, 468, this court held that under the uniformity requirement for nonproperty taxation (Ill. Const. 1970, art. IX, §2), a "classification must be based on a real and substantial difference between the people taxed and those not taxed, and that the classification must bear some reasonable relationship to the object of the legislation or to public policy." (Emphasis omitted.) The *Searle* court specifically rejected the usual equal protection standard which provided that the party attacking a tax classification must "negate every conceivable basis which might support it." (Emphasis omitted.) (*Searle,* 117 Ill. 2d at 468.) Arguing that the language of the uniformity provisions of sections 2 and 4(b) of article IX are similar and that similar constitutional provisions should be construed consistently, Grais urges this court to extend the *Searle* standard to distinctions made by special service area boundaries through the real property uniformity clause in article IX, section 4(b).

We decline to accept Grais' invitation to extend the *Searle* standard in this case. The nonproperty tax uniformity clause provides that "[i]n any law classifying *** non-property taxes or fees, the classes shall be reasonable and *** each class shall be taxed uniformly." (Ill. Const. 1970, art. IX, §2.) Article IX, section 4(b), provides that "counties *** may classify *** real property for purposes of taxation. Any such classification shall be reasonable and assessments shall be uniform within each class." (Ill. Const. 1970, art. IX, §4(b).) Both of these provisions deal with the classification of taxable property. In particular, section 4(b) pertains to counties classifying all real property within their jurisdiction. The city

here is not attempting to impose a higher tax on all the property of a certain class within its borders; it is merely taxing the property which benefits most directly from a special service provided in a limited area within its borders. Furthermore, the city has done this under its special service area power which was clearly meant to be an exception to the requirement of uniformity in article IX.

Grais next claims that the circulator ordinances violate several provisions of the Special Service Area Tax Act (Ill. Rev. Stat. 1989, ch. 120, par. 1300 *et seq.*) (hereinafter the Act). Grais alleges that the taxable area does not constitute a special service area under the Act, that the special service area does not meet the Act's definition of contiguity, that the city did not file an accurate map as required by the Act, and that the city's Notice Ordinance violates the Act.

Grais claims that the taxable area defined by the ordinances does not constitute a special service area for two reasons: (1) it is too large; and (2) transportation is a general rather than a special service. The special service area defined by the city includes 34% of the city's tax base. That is a significant percentage, but it appears that the percentage is that large mainly because the special service area is located in the downtown area, where the city's most expensive real estate is located. Grais cites language in *Hiken* warning that if cities are allowed to exclude certain types of real estate from special service areas, "a city or county could conceivably create a special service area embracing its entire territory," in effect creating a new citywide classification (*Hiken*, 53 Ill. App. 3d at 310). The situation warned of in *Hiken* might be a concern in a future case. Nevertheless, as was the situation in *Hiken*, we do not believe the city's special service area is too large in this case. The special service area defined by the city, while large, is not so

large as to qualify as an attempt to create another city-wide classification system. Furthermore, the area appears to be reasonably tailored to include only that part of the city that needs the services promised by the Central Area Circulator and will benefit most from those services.

Grais alleges that public transportation does not constitute a special service because public transportation affects the interests of the broadest public, not just a narrow group of taxpayers, and because the Illinois Constitution recognizes public transportation as a general government function (Ill. Const. 1970, art. XIII, §7). Grais also alleges that the circulator will affect an especially broad section of the public because it is designed to be integrated into the overall system of mass transit in Chicago.

The Act defines "Special Services" as "all forms of services pertaining to the government and affairs of the municipality." (Ill. Rev. Stat. 1989, ch. 120, par. 1302.) In *Coryn* this court described the test of whether a particular service qualifies as "special service" under article VII, section 6(l), and the Act: "If the project reasonably could have been expected by the home rule unit to make the area taxed, in particular, a better place in which to reside or to conduct business, it qualifies as a 'special service' even though it also may redound to the benefit of the remainder of the home rule unit." (*Coryn*, 71 Ill. 2d at 201-02.) We believe that the circulator project meets this test. While the circulator will benefit residents both inside and outside the perimeter, it is designed to attract more customers and to increase the labor pool available to the businesses in the special service area. The city council could certainly have the reasonable belief that the circulator would make the central area a better place to do business.

Grais next argues that the special service area does not meet the definition of contiguity in the Act. The Act states that "[t]erritory shall be considered contiguous for purposes of this Act even though certain completely surrounded portions of such territory are excluded from the special service area." (Ill. Rev. Stat. 1989, ch. 120, par. 1302.) This definition would appear to allow for the "swiss cheese" nature of the special service area that results from the exclusion of residential property. Grais, however, claims that there are islands of commercial property in the special service area that are completely surrounded by residential property. In support of his claim, Grais cites as his sole example the John Hancock Center, in which the top seven stories are commercial property, but are cut off from the special service area by 49 floors of residential property.

Illinois courts have defined contiguity as having a "substantial common boundary" (*People ex rel. County of St. Clair v. City of Belleville* (1981), 84 Ill. 2d 1, 13) or as "touching or adjoining in a reasonably substantial sense" (*In re Annexation to City of Prospect Heights* (1982), 107 Ill. App. 3d 1045, 1050). Admittedly, the top seven floors of the John Hancock building do not touch any other property in the special service area. Nevertheless, the concept of contiguity traditionally has been applied in a horizontal plane. The "common boundaries" and "touching" referred to in the above-cited cases apply to property lines drawn on the ground, not to the touching of floors 90 stories above the ground. Moreover, the General Assembly amended the Act to include a broad definition of contiguity in order to codify the holding of *Hiken*. In doing so, it was the intent of the legislature to broaden the concept of contiguity rather than limit it. We are not inclined to limit it here.

The Act also requires that when a property tax is levied pursuant to the special service area power, "the mu-

nicipality or county shall file a certified copy of the ordinance creating the special service area, including an accurate map thereof, with the county clerk." (Ill. Rev. Stat. 1989, ch. 120, par. 1310.) The map filed by the city depicts the perimeter boundary and has attached a list of permanent index numbers of the parcels included in the special service area. Additionally, the filed ordinance clearly states that all residential property within the perimeter is excluded from the special service area.

The purpose of the requirement of filing a map with the county clerk appears to be to assist the clerk in apportioning the tax and to provide additional notice to the public of the boundaries of the special service area. It does not appear to us that a map which attempted to outline all of the boundaries between commercial and residential property inside the perimeter would have accomplished these purposes any more effectively. The list of tax index numbers is presumably of more use to the county clerk than a complicated map which attempts to indicate each excluded residential parcel. Additionally, anyone owning real estate within the perimeter is adequately warned of his property's tax status either by its classification or by the list of tax index numbers. Grais argues that the index number list is inadequate because it is current only to the 1988 tax year. Nevertheless, Grais does not claim that anyone examining the map and description filed by the city would have difficulty determining whether or not his property would be subject to the tax. The city used the latest tax data available and filed a map and description defining the special service area that should give adequate notice of the special service area boundaries to owners of property that is located within the perimeter. Accordingly, we conclude that the city has adequately complied with the requirement of filing an accurate map.

The Act requires that notice of a proposed special service area be given to interested members of the public before any taxes are levied. A public hearing must be held within 60 days after the adoption of an ordinance establishing a special service area. Notice of the hearing must be made by publication and by mail to those who paid taxes for the preceding year on the property included in the special service area. (Ill. Rev. Stat. 1989, ch. 120, par. 1305.) The Act provides that notice shall include:

"(1) The time and place of hearing;

(2) The boundaries of the area by legal description and by street location, where possible;

(3) A notification that all interested persons, including all persons owning taxable real property located within the special service area, will be given an opportunity to be heard at the hearing regarding such tax levy *** and

(4) The maximum rate of taxes to be extended in any year ***." Ill. Rev. Stat. 1989, ch. 120, par. 1304.

Grais claims that the notice provided by the city was inadequate for several reasons. First, neither the ordinances nor the notice sent to taxpayers identified the type of transportation system to be used by the circulator, the routes the circulator will follow, or the precise cost. Grais claims that this information is essential for the taxpayer to form a decision about whether to support the project. Second, mailed notice was sent only to the owners of the 4,929 parcels of commercial property within the perimeter in the 1988 tax year.

In *Schwarzbach v. City of Highland Park* (1980), 82 Ill. App. 3d 807, the court stated that "the property owner is entitled to notice which can be plainly understood in the sense that it conveys the information appropriate to form the taxpayer's decision to object or refrain from objecting." (*Schwarzbach*, 82 Ill. App. 3d at

812.) There, the court invalidated the city's notice because it was ambiguous as to whether taxable personalty was to be taxed as well as real estate. (*Schwarzbach*, 82 Ill. App. 3d at 813.) No such ambiguity exists in this case. Neither do we believe that the city's failure to specify the type of transportation, routes, and precise cost of the circulator results in inadequate notice. The statute plainly requires only notice of the hearing, boundaries and the maximum rate of taxes. Grais does not claim that any of these elements were missing. In addition to the information specifically required by the statute, the city's notice stated that the proposed special service area was for "the development, and operation of a downtown public transportation system know [*sic*] as the Central Area Circulator *** providing transportation and related facilities principally within the perimeter of the Area." We believe that the information provided by the city was adequate under the statute. Furthermore, the circulator may cost as much as $750 million to design and build. With costs of this magnitude it is prudent of the city to plan carefully before deciding on a system to build. Requiring great specificity about the project in the notice to taxpayers would prevent the city from collecting revenue through a special service area tax and using that revenue for planning and design.

Grais' second contention is more problematic. The statute requires that taxpayers be mailed individual notice before their property is included in a special service area. But Grais does not claim that he did not receive notice, nor does he identify any other person who owns property that will be taxed but did not receive notice. Grais points out that all the actual parcels to be taxed may not be known until the county completes the tax divisions, consolidations and reclassifications for the 1991 tax year. Nevertheless, we cannot invalidate the entire special service area for inadequate notice based on the

facts pleaded here. The special service area was defined and established by the Notice and Establishment Ordinances. Any taxpayer who is eventually taxed may have an individual dispute with the city if his property was not included within the special service area when it was established or if notice was not provided to him or to his predecessor-in-interest. This, however, does not invalidate the notice given by the city to the rest of the owners of property in the special service area. We conclude that the notice provided by the city was adequate.

We now turn to Grais' arguments challenging the fluctuating nature of the special service area. As a preliminary matter, the city claims that Grais does not have standing to challenge this part of the special service area plan because Grais alleges only that the boundaries will change in the future in some unlawful way and because Grais has in fact suffered no injury. Nevertheless, we believe Grais has standing to raise this issue. In *McKenzie v. Johnson* (1983), 98 Ill. 2d 87, this court held that the plaintiff in that action had standing to challenge several property tax exemption statutes when the plaintiff alleged that the statutes were unconstitutional and would increase his tax liability if enforced. We believe that the same situation exists here. Grais has alleged that the scheme in the circulator ordinances which would periodically take property out of the special service area as it is reclassified is beyond the scope of article VII, contrary to the Special Service Area Tax Act, and would tend to increase Grais' share of the cost of the circulator. Therefore, we hold that Grais has standing to challenge the fluctuating nature of the special service area.

Grais claims that the year-to-year change in the special service area is in violation of the Special Service Area Tax Act because the Act has specific provisions for changing the boundaries of special service areas that would not be followed under the city's ordinances. Sec-

tions 8 and 9 of the Act provide that the boundaries of a special service area may be enlarged after notice, hearing and opportunity to object. (Ill. Rev. Stat. 1989, ch. 120, pars. 1308, 1309.) Section 9a provides that territory constituting less than $1\frac{1}{2}\%$ of the special service area's total value may be disconnected if a majority of residents and property owners petition for disconnection. Ill. Rev. Stat. 1989, ch. 120, par. 1309a.

The city does not argue that these provisions unduly limit the city's power to create or administer special service areas. Rather, it argues only that these provisions do not apply in this case. Essentially, the city's argument is that the procedures for enlargement and disconnection apply only when the city changes the boundaries of the perimeter within which the special service area is located. We disagree. The provisions for enlargement and disconnection apply to the boundaries of the special service area as defined by the ordinances creating the area. Those persons whose property is to be included in the area, or added to it, and therefore taxed, are entitled to notice under the statute and an opportunity to be heard. (Ill. Rev. Stat. 1989, ch. 120, pars. 1304 through 1306, 1308, 1309; see also *Chicago Sheraton Corp. v. Zaban* (1978), 71 Ill. 2d 85, 91-92.) If property is to be disconnected from the area, the owners of property remaining in the area are entitled to notice and an opportunity to object. (Ill. Rev. Stat. 1989, ch. 120, par. 1309a.) Because the special service area at issue here was established by ordinance after notice and hearing afforded to owners of property to be included in the area based on 1988 tax data, the area cannot be changed without complying with the enlargement or disconnection provisions of the Act, whichever the case may be. When property is added to or taken away from the taxable area, the "boundaries" of the special service area are changed. We therefore hold that the city cannot expand or reduce the

taxable area as classifications of property within the perimeter change "from time to time," but that the city must instead follow the procedures of the Special Services Area Act for enlargement and disconnection when the boundaries of the special service area are to be changed.

Because we conclude that the city's scheme for a fluctuating special service area violates the enlargement and disconnection provisions of the Special Service Area Tax Act, we need not discuss whether that aspect of the city's ordinances would be invalidated under any of Grais' other arguments. We note here that the disconnection provisions of section 9a were designed for use by taxpayers who claim they are not receiving benefits from a special service being provided. In the case before us, the city is the party wishing to disconnect residential property from the special service area through a self-executing disconnection scheme. The special service area power is not self-executing, however (*Oak Park*, 54 Ill. 2d at 205), and there must therefore be enabling legislation if the city is to have procedures other than section 9a for the disconnection of territory.

While we find that the city's scheme for a fluctuating special service area is improper, we need not invalidate the ordinances in their entireties. The ordinances have specific severability clauses (Establishment Ordinance §9; Governance Ordinance §11; 1991 Levy Ordinance §9), and we believe that the city council would have intended that the remaining provisions remain in force despite the inability to have a fluctuating area. (See *People ex rel. Chicago Bar Association v. State Board of Elections* (1990), 136 Ill. 2d 513, 532-33.) We therefore find the ordinances to be severable and that finding one portion of the ordinances is invalid does not affect the validity of the others.

We hold that the City of Chicago may establish the special service area as provided in the special service area ordinances. The city may not, however, vary the parcels included in the special service area, and therefore subject to the special service area tax, unless the statutory procedures for enlargement and disconnection are observed.

For the reasons stated, the judgment of the circuit court is affirmed in part and reversed in part.

*Affirmed in part and*
*reversed in part.*